COMMONWEALTH *vs.* SCOTT E. CHIPMAN.

Plymouth. April 4, 1994. - July 11, 1994.

Present: LIACOS, C.J., ABRAMS, NOLAN, LYNCH, & GREANEY, JJ.

*Identification. Joint Enterprise. Homicide. Practice, Criminal*, Required finding, Capital case. *Evidence*, Demonstration, Videotape, Admissions and confessions. *Constitutional Law*, Admissions and confessions.

At a murder trial the evidence was sufficient to permit a rational trier of fact to infer that the defendant fired the fatal shot [267-268] or that he was a joint venturer in the fatal assault [268-269], and that the murder was committed with deliberate premeditation. [269-270]

At a murder trial, the judge properly within his discretion admitted a videotaped simulation of the view through a telescopic sight from the site of a shooting to the road along which the victim was traveling in a vehicle when shot by a rifle [270-271], and the fact that the videotape was made ten months after the shooting did not render the depiction of the view unfair or misleading. [271]

The record of a hearing on a motion to suppress evidence at a murder trial amply supported the judge's determination that certain inculpatory statements of the defendant, made while in custody and after invoking his right to counsel and to remain silent, were not the product of an interrogation but rather were freely and voluntarily made. [271-273]

INDICTMENTS found and returned in the Superior Court Department on March 4, 1991.

A pretrial motion to suppress evidence was heard by *J. Harold Flannery*, J., and the cases were tried before him.

*Joseph F. Krowski* for the defendant.

*Frank M. Gaziano*, Assistant District Attorney, for the Commonwealth.

ABRAMS, J. Following a jury trial, the defendant, Scott E. Chipman, was convicted of murder in the first degree, armed assault with intent to murder, assault and battery by means of a dangerous weapon, assault by means of a dangerous

weapon, two indictments charging malicious injury to property exceeding $250, and unlawfully carrying a rifle or shotgun. On appeal, the defendant challenges the sufficiency of the evidence to show: (a) the identity of the defendant as the person who shot the victim; (b) joint venture; (c) deliberate premeditation and extreme atrocity or cruelty; (d) the admission of a videotaped simulation of the sniper's view of the scene; and (e) the denial of the defendant's motion to suppress his statements to the police.[1] We conclude that there was no reversible error. We also conclude that we should not exercise our power under G. L. c. 278, § 33E (1992 ed.), to order a new trial or to enter a lesser degree of guilt on the conviction for murder in the first degree. We affirm the judgments.

1. *The facts.* We set forth the facts in the light most favorable to the Commonwealth. *Commonwealth* v. *Salemme*, 395 Mass. 594, 595 (1985). At approximately 9:20 A.M. on January 5, 1991, the victim, fourteen year old Robyn Dabrowski, was fatally shot while riding in a school bus traveling on Route 25 in Plymouth.[2] The lethal bullet was fired from a .30 caliber M-1 carbine. It was shot from a nearby wooded area and struck the bus in a direct line. The fatal shot did not ricochet.

Just before Dabrowski was fatally shot, Lance Magnusen, who was driving his Mercedes automobile along the same stretch of Route 25, heard a loud bang in the back of his car. His rear windshield had been shattered. He pulled over and saw a small hole in the passenger side of the rear window and two holes in the interior on the driver's side rear roof support. The police recovered fragments of a .30 caliber full "copper-jacketed" bullet from the driver's side rear roof support of the Mercedes. This bullet was fired from the same weapon as the bullet that killed Robyn Dabrowski.

---

[1]The defendant's arguments are largely directed at his conviction for murder in the first degree, and not the other convictions.

[2]The bullet that killed Dabrowski grazed another passenger, Susan Arruda, in the throat.

A few minutes after the fatal shooting, Brian Patterson and Terry Everett saw an early 1980's gray Chevrolet Caprice automobile containing two white male occupants with short, dark hair and mustaches drive away from the area where the shots had been fired. Both the defendant and his near constant companion in late December, 1990, and early January, 1991, William Ferrara, had short, dark hair and mustaches on January 5, 1991. In addition, from January 3, 1991, through January 7, 1991, the defendant had a rented 1983 gray Chevrolet Caprice automobile.

In July, 1990, the defendant had purchased some stereo equipment from Scott DeMacedo of Yarmouthport. The transaction occurred in the living room of DeMacedo's house, where there was a gun cabinet containing a .30 caliber M-1 carbine rifle equipped with a telescopic sight and a .410 gauge shotgun. On January 2, 1991, the carbine and the shotgun were stolen from DeMacedo's gun cabinet. Other valuable items were not taken from DeMacedo's home.

On January 3, 1991, Caren Stenroos, a friend of both the defendant and Ferrara, went to Ferrara's house, where the defendant was then residing. Stenroos saw a gun clip on the dining room table. When the defendant came home, he displayed both an M-1 carbine and a .410 gauge shotgun to Stenroos and told her that both guns belonged to him.

On January 4, 1991, the defendant and Ferrara went to Worcester to purchase ammunition for the guns. That evening, from approximately 7:30 to 9:30, the defendant and Ferrara shot targets on the beach near Ferrara's house. Three of Ferrara's neighbors, Angela Pittsley, Malcolm MacKinnon, and Louise MacKinnon heard the gunfire associated with this target shooting. While the target practice was in progress, Pittsley saw two men shooting on the beach. After the gunfire ended, Malcolm and Louise MacKinnon saw the defendant and Ferrara walk up from the beach area carrying rifles. The police found two spent .30 caliber carbine cartridge casings on the beach. The carbine casings were

fired from the same weapon as the bullet that killed Robyn Dabrowski.

At approximately 9:30 P.M., the defendant and Ferrara arrived at Stenroos' house, where they proceeded to discuss the target shooting. The defendant told Stenroos that he had used the "more high tech" gun. The defendant stated that Ferrara's marksmanship "sucked" and that he had to teach Ferrara "how to hold the gun and shoot it."

At 10:30 A.M. on the day of the shooting, January 5, 1991, Malcolm and Louise MacKinnon saw two rifles protruding from the front door of Ferrara's house. The rifles were being fired in the direction of the beach in front of Ferrara's house. The MacKinnons saw the defendant leave the house and then return fifteen minutes later. When the defendant returned, several more shots were fired from the house.

At 11:10 A.M. on January 5, 1991, the defendant appeared at Stenroos' house and said that he and Ferrara had been out shooting by the power lines, which run parallel to Route 25, earlier that morning. The defendant told Stenroos that Ferrara's marksmanship had again "sucked" but that, because of the telescopic sight the defendant had on his gun, he "could . . . hit anything that he aimed at."

In a search of the area around the power lines, the police found several spent .30 caliber carbine and .410 gauge shotgun casings, an unexpended .30 caliber round and three expended .30 caliber projectiles. The pattern of these casings and the expended projectiles indicated that the area had been used for target shooting. One of the targets shot at in this area was an abandoned stove. The bullets which had been fired at this stove had passed completely through it.

The police also conducted a search along the Gas Line Road, which is in the immediate vicinity of the power lines. Specifically, the police searched a dirt path which runs up from the Gas Line Road to Route 25. Along this dirt path, the police found several expended .30 caliber carbine casings. Five of these casings were found in a cluster. The police determined that it was from this "casing cluster" site, which

afforded a clear view of the middle lane of Route 25, 126 yards away, that the fatal shot was fired.[3] According to State Trooper, and firearms identification expert, Michael Robert Arnold, the carbine casings found at this site and those found by the power lines and on the beach in front of Ferrara's house, along with the projectiles that were recovered from the school bus, from the Mercedes automobile and from the area by the power lines, were all fired from the same weapon.

During the evening of January 5, 1991, Stenroos was with the defendant as he moved his belongings out of Ferrara's house. When the defendant took the carbine out of the house, he held it straight down along the left side of his body so that it was even with his leg. Stenroos asked the defendant "[W]hy he was trying to hide the gun?" He responded, "You never know what neighbors are going to do."

Later that evening, as the defendant, Stenroos, and Ferrara sat talking in Stenroos' house, they saw a news report on television concerning the shooting of Robyn Dabrowski. When Ferrara heard the news report, he said that "he hoped it wasn't them who did it." The defendant then stated that he needed a place to put his gun. Stenroos told the defendant that he could not keep the gun at her house and that, as far as she was concerned, "he could throw it in the [Cape Cod] Canal."[4]

As the defendant and Ferrara left Stenroos' house, Ferrara brought up the subject of the highway shooting and the defendant told him to "shut up." The defendant then told Ferrara that, "if anything came back on [the defendant] about the shooting, [the defendant] would know where it came from and he would come back."

On January 6, 1991, the defendant went to the home of Richard Edwards in Hyannis to watch football games and to drink beer. At some point, the game was interrupted by a news bulletin concerning the search for the weapon used in

---

[3]According to the evidence presented at trial, an M-1 carbine's effective range is approximately 150 yards.

[4]The weapon which fired the fatal shot has not been recovered.

the highway shooting. The defendant declared that if he had been the sniper, he "would have thrown [the rifle] in the [Cape Cod Canal]."

On or about January 6, 1991, Edwards found a telescopic sight underneath a chair in his living room. On the morning of January 8, 1991, the defendant went to Edwards' house and asked if anyone had seen the "scope." When Edwards could not find the scope, the defendant became very angry and stated that someone "better find it."

On January 7, 1991, while the defendant was riding in an automobile with Billy Criscoe and Philip Spencer, a report concerning the highway shooting was broadcast over the radio. Noting that the lethal bullet had passed through the metal side of a school bus, Criscoe remarked that the sniper must have used "a pretty powerful weapon . . . something like a .30-.30 Winchester." The defendant replied that "it could have been an M-1 carbine . . . those are powerful weapons, too."

2. *The sufficiency of the evidence with respect to the identity of the defendant as the person who shot the victim and joint venture.* Relying on *Salemme, supra,* the defendant argues that the Commonwealth failed to present sufficient evidence to permit a rational trier of fact to infer that he, not Ferrara, fired the fatal shot. We do not agree.

Viewed in the light most favorable to the Commonwealth, see *Commonwealth* v. *Latimore,* 378 Mass. 671, 676-677 (1979), the evidence would permit a rational jury to infer that the defendant, not Ferrara, knew of DeMacedo's gun cabinet; that the defendant used the .30 caliber M-1 carbine rifle with the telescopic sight; that the fatal shot was fired from the M-1 carbine with the telescopic sight; that the defendant was an excellent marksman; that Ferrara used the shotgun; that Ferrara's aim was poor; that the lethal bullet struck the bus in a direct line and did not ricochet; that, after the shooting, the defendant threatened Ferrara; that the defendant asked Stenroos to hide the M-1 carbine; that the defendant had the telescopic sight after the killing; that, after the murder, the defendant made inculpatory statements

to friends; and that, after he was arrested, the defendant made inculpatory statements to the police, see *infra* at 271-273. There was ample evidence to support the jury's conclusion that the defendant fired the fatal shot. "Circumstantial evidence may be a thoroughly satisfactory basis for conviction of the highest crimes." *Commonwealth* v. *Richmond*, 207 Mass. 240, 246 (1911). See *Commonwealth* v. *Cordle*, 412 Mass. 172, 175 (1992).

Further, unlike *Salemme*, in this case the Commonwealth presented a theory that the defendant was guilty either directly or as a joint venturer. A joint venturer is "one who aids, commands, counsels, or encourages commission of a crime while sharing with the principal the mental state required for the crime." *Commonwealth* v. *Soares*, 377 Mass. 461, 470, cert. denied, 444 U.S. 881 (1979). To convict a defendant of murder on a joint venture theory, the Commonwealth must establish that the defendant "was (1) present at the scene of the crime, (2) with knowledge that another intends to commit the crime or with intent to commit a crime, and (3) by agreement [was] willing and available to help the other if necessary." *Commonwealth* v. *Bianco*, 388 Mass. 358, 366, *S.C.*, 390 Mass. 254 (1983).

Viewed in the light most favorable to the Commonwealth, the evidence would permit a rational jury to infer that the defendant took Ferrara to the scene of the shooting in the defendant's rented automobile; that the defendant was there when the fatal shot was fired; that the defendant provided Ferrara with a gun and taught Ferrara how to use it; that the defendant knew or should have known that Ferrara was shooting at passing traffic; that, after the shooting, the defendant drove Ferrara from the murder scene in the defendant's rented automobile; and that, after the shooting, the defendant asked Stenroos to hide the murder weapon. "Direct evidence of who shot the victim[ ] 'is not required where, as here, there is strong circumstantial evidence that one of the [assailants] shot' the victim[ ]." *Commonwealth* v. *Cohen*, 412 Mass. 375, 381 (1992), quoting *Commonwealth* v. *Casale*, 381 Mass. 167, 174 (1980). The judge did not err in

denying the defendant's motion for a required finding of not guilty on the ground that there was no evidence of a joint venture.

3. *The sufficiency of the evidence with respect to murder in the first degree.* "[I]n order to convict a defendant of murder in the first degree, other than felony murder, the Commonwealth must prove that the defendant unjustifiably killed another, and that he intended to kill or to do grievous bodily harm to the victim, or that he intended to do an act creating a plain and strong likelihood that the victim's death or grievous harm would follow. The Commonwealth must also prove that the defendant acted with premeditation, or that the defendant acted with extreme atrocity or cruelty." *Commonwealth* v. *Puleio*, 394 Mass. 101, 108 (1985). The judge submitted separate verdict slips to the jury on deliberate premeditation and extreme atrocity or cruelty.

To prove that a defendant committed murder with deliberate premeditation, the Commonwealth must prove that the defendant resolved to kill after a period of reflection. *Commonwealth* v. *Blaikie,* 375 Mass. 601, 605 (1978). No particular period of reflection is required for deliberate premeditation to be found. *Commonwealth* v. *Caine*, 366 Mass. 366, 374 (1974), and cases cited. The law recognizes that a plan to murder may be formed within a few seconds. *Commonwealth* v. *Basch*, 386 Mass. 620, 622 (1982). As such, it is the sequence of the thought process rather than the time which is taken to think that is the key to determining whether someone acted with deliberate premeditation. The thought process is often characterized as "[f]irst the deliberation and premeditation, then the resolution to kill, and lastly the killing in pursuance of the resolution." *Commonwealth* v. *Tucker*, 189 Mass. 457, 494-495 (1905).

Viewed in the light most favorable to the Commonwealth, the evidence would permit a rational jury to infer that, on the morning of the shooting, the defendant brought a loaded M-1 carbine into a wooded area near Route 25; that, after shooting at some targets by the power lines and seeing that the bullets he was firing could penetrate metal, the defendant

crossed Route 25 and proceeded to a spot along a dirt path which afforded a clear view of the middle lane of Route 25; that the defendant shot at and hit Magnusen's Mercedes automobile before shooting at the bus; and that the defendant was aiming at the school bus with the M-1 carbine equipped with a telescopic sight when he fired the fatal shot. The evidence would permit a rational jury to conclude that the defendant committed murder in the first degree on the basis of deliberate premeditation. Thus, the judge's denial of the defendant's motion for a required finding of not guilty on this issue was proper.[5]

4. *The admissibility of the videotaped simulation.* The defendant challenges the admission of a videotaped simulation of the view which a person standing at the fatal shooting site and looking through the defendant's telescopic sight would have of a school bus traveling along Route 25.[6] A videotaped demonstration may be admitted in evidence provided it "sufficiently resembles the actual event so as to be fair and informative." *Terrio* v. *McDonough,* 16 Mass. App. Ct. 163, 173 (1983). "Whether the conditions were sufficiently similar to make the observation [offered by the demonstration] of any value in aiding the jury to pass upon the issue ·submitted to them [is] primarily for the trial judge to

---

[5]Because the jurors were warranted in determining that the murder was committed with deliberate premeditation, we need not address the question whether the jurors also were warranted in determining that the murder was committed with extreme atrocity or cruelty. "Where a crime can be committed in any one of several ways . . . [t]hen the defendant should be convicted if it is proved that he committed the crime in any of those ways." *Commonwealth* v. *Dowe,* 315 Mass. 217, 219-220 (1943). See *Commonwealth* v. *Keevan,* 400 Mass. 557, 565 (1987); *Fadden* v. *Commonwealth,* 376 Mass. 604, 609-610 (1978), cert. denied, 440 U.S. 961 (1979).

[6]The videotape was produced by State police Sergeant Robert Kelliher and David Smith, an investigator with the Plymouth County district attorney's office. Kelliher and Smith made the videotape by mounting the defendant's telescopic sight on an M-1 carbine and then using a video camera to record what one would see by looking through the telescopic sight to Route 25. To depict what the sniper likely saw as he fired the fatal shot, Kelliher recorded, through the scope, the view of a school bus driving by the site in the middle lane of Route 25.

determine as a matter of discretion. [The judge's] decision in this respect will not be interfered with unless plainly wrong." *Field* v. *Gowdy*, 199 Mass. 568, 574 (1908). See *Commonwealth* v. *Flynn*, 362 Mass. 455, 473 (1972); *Commonwealth* v. *Chin Kee*, 283 Mass. 248, 260 (1933).

The judge's decision to admit the videotape was not plainly wrong. The videotape was informative because, by showing what the sniper likely observed at the moment he fired the fatal shot, it shed light on the issues of malice aforethought, deliberate premeditation, and extreme atrocity. The videotape was fair because the evidence concerning the cluster of expended .30 caliber casings found on the spot where the videotape was recorded and the distance to and the view of Route 25 from this spot indicated that the fatal shot was fired from this site.

The fact that the shooting occurred on January 5, 1991, and the videotaping took place on November 7, 1991, did not make the videotape unfair or misleading. Sergeant Kelliher, who was in the Gas Line Road area on the day of the shooting, testified that the foliage was denser at the spot where the videotape was recorded on November 7, 1991, than it had been on January 5, 1991. This observation was verified by an aerial photograph of the area taken on January 5, 1991. Therefore, if anything, the sniper had a better view of the traffic passing by along Route 25 on the day of the shooting than was depicted in the videotape. After reviewing the videotape, we conclude that it was not unfair to the defendant and that there was no error in admitting it in evidence.[7]

5. *The admissibility of the self-incriminating statements made by the defendant while in police custody.* Prior to trial, the defendant filed a motion, the denial of which he chal-

---

[7]The defendant complains that the videotape contains the repeated sound of a camera clicking which the jury could have taken to be the sound of a gun being fired. The defendant asserts that these sounds created the impression that the sniper fired several shots at the school bus. After reviewing the videotape, we conclude that the jury could not take the sound in question to be anything other than the sound of a camera.

lenges on appeal, to suppress incriminating statements. The judge held a hearing on the defendant's motion and made the following findings of fact. On January 10, 1991, Detective Robert Kurisko and Sergeant Martin Murphy of the Dennis police department arrested the defendant for the murder of Robyn Dabrowski at the home of the defendant's mother and stepfather. After Sergeant Murphy informed the defendant of the warnings outlined in *Miranda* v. *Arizona*, 384 U.S. 436, 444-445 (1966), the defendant claimed his right to counsel and to remain silent. The officers then put the defendant in the police cruiser for the approximately eight-minute ride to the State police barracks in South Yarmouth. En route, the defendant asked, in substance, where they were going and what the initial proceedings would be. Detective Kurisko told the defendant their destination and outlined the booking and arraignment procedures. The defendant then asked why he was being portrayed on the television news as "armed and dangerous." Sergeant Murphy answered, "[B]ecause the gun is still missing." The defendant said, "The what?" Detective Kurisko replied, "The rifle." The defendant then stated, "I don't have any rifle. Those guys were supposed to have buried that gun." Neither Detective Kurisko nor Sergeant Murphy asked the defendant any questions after the defendant invoked his right to an attorney.

It is undisputed that the inculpatory statements were made after the defendant had been arrested and after he had claimed his right to counsel and to remain silent. The defendant asserts that these statements were made in the course of a police interrogation. We disagree.

In *Miranda*, *supra* at 444, the United States Supreme Court defined "custodial interrogation" as questioning initiated by a law enforcement official after a suspect has been deprived of his freedom. The Supreme Court noted that not all statements made by a defendant after being taken into custody are to be considered the product of interrogation. *Id.* at 478. See *Commonwealth* v. *Brant*, 380 Mass. 876, 883, cert. denied, 449 U.S. 1004 (1980). "Any statement given

freely and voluntarily without any compelling influences is, of course, admissible in evidence." *Miranda, supra.*

The judge determined that the statements made by the defendant in the police cruiser were not the product of interrogation or its functional equivalent. See *Miranda, supra* at 478; *Rhode Island* v. *Innis*, 446 U.S. 291, 300-301 (1980). Neither Detective Kurisko nor Sergeant Murphy engaged in any express questioning of the defendant in the police cruiser. The officers answered the questions which the defendant posed to them in a cursory and direct manner without engaging in any type of prodding designed to elicit inculpatory statements. As the judge noted, "There is no indication that [Detective Kurisko and Sergeant Murphy], when they answered [the defendant's] questions, intended to elicit from him anything about the alleged crimes, nor is there any indication that [the defendant], who initiated the conversation, thought that he was being questioned." The judge's determination that the inculpatory comments were made freely and voluntarily is amply supported by the evidence. There was no error in denying the motion to suppress.

6. *Review pursuant to G. L. c. 278, § 33E.* We have reviewed the record as a whole and conclude that there is no reason either to order a new trial or to enter a verdict of a lesser degree of guilt on the conviction of murder in the first degree.

*Judgments affirmed.*