COMMONWEALTH *vs.* JAMEEL WILLIAMS.

Norfolk. January 11, 2008. - March 24, 2008.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, & BOTSFORD, JJ.

*Homicide. Practice, Criminal,* Capital case, New trial, Instructions to jury, Witness, Argument by prosecutor. *Joint Enterprise. Evidence,* Joint enterprise, Failure to produce witness.

At a murder trial, the judge did not err in submitting questions of both principal and joint venture liability to the jury, without requiring the jury to specify the theory of liability on which they rested their verdict, where the evidence, viewed in the light most favorable to the Commonwealth, supported a finding that the defendant acted as the principal as well as a joint venturer. [898-899]

At a murder trial, the judge did not abuse his discretion in declining to give a missing witness instruction, where the testimony of the witness was not essential to the case of the Commonwealth, the party against which an inference would be drawn from the witness's absence; where there was no evidence that the witness was physically available to the Commonwealth, that it knew of his whereabouts, or that it deliberately was concealing his whereabouts; and where there was a plausible reason (i.e., fear) for the witness's unwillingness to disclose his whereabouts. [899-902]

At a murder trial, the prosecutor's closing argument, in which the prosecutor gave unsworn testimony that went to a critical issue in the case and improperly vouched for a key Commonwealth witness [905-906], improperly urged the jury to do something beyond impartial fact finding [906-907], and asserted, without foundation, that a witness feared testifying against the defendant [907-908], constituted prejudicial error requiring reversal of the defendant's convictions and a new trial.

INDICTMENTS found and returned in the Superior Court Department on August 27, 2002.

The cases were tried before *John C. Cratsley*, J.

*Stephen B. Hrones* (*Michael Tumposky* with him) for the defendant.

*Varsha Kukafka*, Assistant District Attorney, for the Commonwealth.

SPINA, J. The defendant was convicted of murder in the first degree in connection with the death of Gregory Cormier, under

theories of deliberate premeditation and extreme atrocity or cruelty, and of armed assault with intent to murder Wayne Jackson on June 10, 1994, in Milton. On appeal he argues that a new trial is required because (1) the jury were instructed on both principal and joint venture theories of liability but the evidence was insufficient to support a theory that the defendant was the principal, and the jury were not asked to specify the theory of liability on which their verdict rested, cf. *Commonwealth* v. *Cannon*, 449 Mass. 462, 475 (2007); (2) the judge should have given the jury a missing witness instruction; and (3) in his closing argument the prosecutor engaged in multiple misconduct, including giving unsworn testimony corroborating the testimony of the Commonwealth's key witnesses and interjecting his own credibility into the Commonwealth's plea agreements with key witnesses. We conclude that the prosecutor's closing argument is so replete with prejudicial improprieties that the convictions must be reversed and the case remanded for a new trial.

1. *Background.* The jury could have found as follows. Shortly before 11 P.M. on June 10, 1994, police were dispatched to a shooting that occurred near the intersection of Lothrop Avenue and Churchill Street in Milton. When they arrived they saw a bullet-riddled Mazda sedan automobile that had rolled to a stop in some bushes. Its engine was running, the headlights were on, and music was blaring. The driver, Gregory Cormier, was dead. The passenger, Wayne Jackson, suffered gunshot wounds to the neck and chest, but he survived. Cormier suffered four gunshot wounds to his back, one of which caused fatal internal hemorrhaging.

Police recovered eight nine millimeter Luger caliber cartridge casings near the sidewalk in front of 22 Churchill Street in the vicinity of the car, all fired from the same semiautomatic pistol. Three damaged lead projectiles capable of being fired from a .38 special caliber revolver or a .357 magnum revolver were recovered from the battery in the engine compartment of the Mazda, from the driver's side door mirror of the Mazda, and from the stairs at 1 Lothrop Avenue. It could not be determined if they were fired from the same gun. Lead projectile fragments were recovered from Jackson's clothing, Churchill Street, the Mazda windshield wiper deck, the Mazda passenger door "pil-

low," and the Mazda driver's door. No determination could be made as to their type of ammunition or the type of gun from which they were fired. The same is true of the lead core portion of a jacketed projectile recovered from Cormier's clothing.

Six nine millimeter .38 caliber class full metal jacketed spent projectiles, all fired from the same gun, were recovered from Cormier's T-shirt, Cormier's right jaw,[1] Jackson's clothing, the trunk of the Mazda, the driver's side door "pillow" of the Mazda, and the floor below the Mazda front passenger seat. It could not be determined, without having the suspect gun, whether the same gun that discharged the eight cartridge casings also fired the six nine millimeter .38 caliber class full metal jacketed spent projectiles. The six spent projectiles, which had the same identifying rifling characteristics, could have been fired from any one of a variety of guns, including a nine millimeter Luger semiautomatic pistol and a .357 magnum revolver. It could not be determined which gun fired those projectiles without the suspect gun. At least two and possibly more guns were used in the shooting. None was recovered.

Five days before Cormier was killed, Ato Murrell (Ato) was shot to death on Belnel Road in the Hyde Park section of Boston. Ato's brother, Kenyatta Murrell (Murrell),[2] and the defendant were members of a Hyde Park gang called the Belnel Dogs. They discussed retaliating against the Greenfield Browns, a rival gang from Hyde Park, for Ato's death. Cormier was associated with the Greenfield Browns, although he had moved to the town of Milton for his high school years. On June 10, 1994, Murrell talked to Belnel Dogs members Kent Grays, Marcelus Durham, James Peebles, and Albert Banks about retaliating against the Greenfield Browns for Ato's killing.

On the evening of June 10, 1994, the defendant, Murrell, and Lonnie Smith were in a car driven by Shawn Castle.[3] The defendant spotted Cormier's car and directed Castle to follow it. They followed the car into Milton. When it turned down a side

---

[1] This projectile entered the back and came to rest under the skin surface of the jaw. It did not affect any vital organ.

[2] Kenyatta Murrell was a codefendant in this trial, and he was convicted of the same offenses as the defendant. His appeal has not yet been heard.

[3] Kent Grays, Marcelus Durham, James Peebles, and Albert Banks set out to steal a car for the purpose of hunting the Greenfield Browns, but were unsuccessful.

street and the brake lights went on, Murrell told Castle to turn down the next street. It was a dead-end street. Castle parked his car. The defendant and Murrell got out of the car and disappeared. Within thirty seconds Castle heard a series of popping sounds. The defendant and Murrell reappeared shortly thereafter, running back to Castle's car. Murrell told Castle to pull out. Murrell was complaining that his gun had jammed on him again. After several attempts in the car he freed the obstruction. When they arrived at Belnel Village in Hyde Park, the defendant and Murrell got out of the car. Murrell looked skyward and screamed, "We got him Cube, we got him. We killed him." Cube was the nickname of Murrell's deceased brother.

Minutes later Castle saw them again, and he gave them a ride to Peebles's house. On the way they stopped a car with Peebles, Grays, Durham, and Banks inside. Murrell told them that things were going to get "hot" in Belnel Village and that they should meet at Peebles's house. After they arrived at Peebles's house, Murrell and the defendant celebrated their success by regaling fellow gang members with details of the shooting. Murrell announced that he had just shot somebody in Milton but they did not know whether they had killed anybody. The defendant told them if anybody said anything, there would be problems. Murrell told Grays his first shot went through the back window and must have hit the driver because all motion in the car stopped and the car started rolling. He said they ran to the side of the car and started shooting through the side window. The defendant produced a pearl-handled .357 magnum revolver and handed it to Peebles. The defendant told Durham that he had "straightened something up in Milton." He said that he jumped over some fences and ran up to the Mazda and shot into the car. Murrell told him to be quiet and stop talking so much. The defendant and Murrell talked about taking showers to wash off the gunpowder from their hands and bodies, and changing clothes. They both went upstairs and showered.

The next day, at Ato's funeral, Murrell told Durham they followed the Mazda, jumped over some fences, and shot into the back of the car. When the car started to roll, they ran up to it and shot through the driver's side window. The car kept rolling and they fled. Murrell said he used a nine millimeter gun and

the defendant used a .357. The defendant bragged that he did more work because his gun was bigger. Murrell told Castle at the funeral that he shot into the back of the car and through the side window; he said the defendant shot from the front of the car. At a later date Murrell told Grays he used a nine millimeter Browning and the defendant used a .357 magnum.

2. *Sufficiency of evidence of principal liability.* The defendant argues that the judge erred by submitting questions of both principal and joint venture liability to the jury in the absence of evidence that the defendant fired any shot that struck Cormier in the back. Because the jury were not required to specify the theory of liability on which they found the defendant guilty of murder, he continues, there is no way of knowing if even one juror may have voted to convict on a theory of principal liability. The Commonwealth contends the evidence supports a finding that the defendant acted as principal.

Our cases have held that a new trial is required where a jury are not required to specify the theory of liability on which they rested their verdict, and the evidence supports a finding of either principal or joint venture liability, but not both. See *Commonwealth* v. *Rolon*, 438 Mass. 808, 819-820 (2003) (evidence sufficient to establish joint venture liability, but insufficient to establish principal liability); *Commonwealth* v. *Green*, 420 Mass. 771, 779-781 (1995) (evidence sufficient to establish principal liability, but insufficient to establish joint venture liability). However, where the evidence establishes that two persons are culpable for a crime, but the evidence fails to establish who was the principal and who was the joint venturer, a jury are warranted in inferring that both were either the principal or the joint venturer. *Commonwealth* v. *Chipman*, 418 Mass. 262, 267-269 (1994). *Commonwealth* v. *Cohen*, 412 Mass. 375, 380 (1992). *Commonwealth* v. *Mahoney*, 406 Mass. 843, 847-848 n.3 (1990).

Viewed in the light most favorable to the Commonwealth, *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979), the evidence supports a finding that the defendant acted as the principal. Projectiles recovered from Cormier's shirt and jaw, and from the inside of the car, could have been fired from a .357 magnum, the type of gun the defendant was using. The defendant bragged about doing more work than Murrell. There

was evidence that he fired into the rear of the car, and into the driver's side window. Consequently, there was evidence from which the jury could have concluded that he fired the fatal shot.

Three projectiles were recovered from Cormier's body and clothing at the autopsy. The fatal shot entered the mid-left back area. It passed through the left lung, the aorta, the esophagus, the inferior vena cava (near the heart), the right lung, and finally passed out of the body just lateral to the right nipple. The record is not clear which of the two projectiles recovered from Cormier's clothing at autopsy, if either, was the fatal shot. Consequently, it is not clear from the record whether the fatal shot was among the six identifiable projectiles fired from a single gun, or whether it was the unidentifiable core portion of a jacketed projectile recovered from Cormier's clothing. It is also not known where the fatal shot came in the series of shots. In any event, the evidence permits a finding that Cormier was struck by bullets fired from two guns, and it is unknown which gun fired the fatal shot. Moreover, the evidence permits a finding that the fatal shot may have been fired through the driver's window as Cormier was slumping over (either from having been hit or while seeking cover), and not necessarily through the rear window, as the defendant contends.

The evidence supports a finding that the defendant acted as principal as well as joint venturer, and therefore the jury's verdict, nonspecific as to the theory of liability, was not defective. *Commonwealth* v. *Cohen, supra.*

3. *Missing witness instruction.* The paramedic who rode with Wayne Jackson, the surviving victim, in the ambulance from the scene of the shooting testified that he and his partner asked Jackson what happened to him, and Jackson responded that he had been shot. They asked him if he knew who shot him, and he said, "Yes. I'm not telling."

The prosecutor had announced on the first day of testimony that he would not be calling Jackson to testify. A lieutenant detective with the Milton police department testified that he had spoken to Jackson approximately three and one-half weeks earlier in a telephone conference call originated by Jackson's mother. He tried but was unable to get Jackson's telephone number. The prosecutor represented to the court that he did not

know Jackson's address, and at most only believed he was in California. The defendant requested a missing witness instruction.

Defense counsel asked the jury, in his closing argument, to take notice of the fact that Jackson did not testify. He recalled the testimony of the paramedic who said Jackson told him he knew the identity of the shooter, and he implied that if the shooter really were the defendant Jackson would have been called so to testify. He also implied that Jackson's absence meant that he would not have identified the defendant as a shooter. After the arguments, the judge ruled that a missing witness instruction was not warranted because the defendant had not made a preliminary showing that Jackson was under the unique control of the Commonwealth. He concluded that Jackson "seems to be someone who simply doesn't want to let anybody know where he is," and that the Commonwealth could not find him.

The defendant argues that it was error not to give a missing witness instruction. "Whether an inference can be drawn from the failure to call witnesses necessarily depends, as with inferences generally, upon the posture of the particular case and the state of the evidence." *Commonwealth* v. *O'Rourke*, 311 Mass. 213, 222 (1942). There are many factors that a judge should consider in deciding whether comment by counsel, or instruction by the judge, is appropriate. They include, without limitation, the strength of the case against the party against which the adverse inference is sought to be drawn or, stated otherwise, the importance of the testimony of the missing witness to that party; the "physical availability of the witness, and the likelihood that he can be produced by summons or otherwise," absent a plausible reason for nonproduction; whether the evidence could be produced from other sources; and whether the witness is equally available to either party, although "there is no hard and fast rule" precluding the inference from the failure to call such a witness. *Commonwealth* v. *Franklin*, 366 Mass. 284, 293 (1974). See *Commonwealth* v. *Graves*, 35 Mass. App. Ct. 76, 82-87 (1993). See also M.S. Brodin & M. Avery, Massachusetts Evidence § 3.6.2 (8th ed. 2007 & Supp. 2008). "Because the inference, when it is made, can have a seriously adverse effect on the noncalling party — suggesting, as it does, that the party has

wilfully attempted to withhold or conceal significant evidence — it should be invited only in clear cases, and with caution." *Commonwealth* v. *Schatvet*, 23 Mass. App. Ct. 130, 134 (1986), and cases cited. We review a judge's decision to give or not give a missing witness instruction under the abuse of discretion standard. See *Commonwealth* v. *Thomas*, 429 Mass. 146, 151 (1999); *Commonwealth* v. *Anderson*, 411 Mass. 279, 283 (1991) ("In the last analysis, the trial judge has discretion to refuse to give the instruction . . . and, conversely, a party who wishes the instruction cannot require it of right").

Applying these factors, we conclude the judge did not abuse his discretion in refusing to give a missing witness instruction. Jackson's testimony was not essential to the Commonwealth's case — it had the testimony of Castle, who drove the defendant and Murrell in their pursuit of Cormier and to the drop-off point near the scene of the shooting. Castle, Durham, and Grays testified to admissions made by the defendant and Murrell. There was no evidence that Jackson was physically available to the Commonwealth, that it knew of his whereabouts, or that it deliberately was concealing his whereabouts. Finally, there was a plausible reason for Jackson's unwillingness to disclose his whereabouts: fear. See *Commonwealth* v. *Ivy*, 55 Mass. App. Ct. 851, 860 (2002). See also *Commonwealth* v. *Gagliardi*, 29 Mass. App. Ct. 225, 243-244 (1990). However, it is not clear from the record who Jackson feared, or why.

The defendant contends that the judge undercut his missing witness argument, which he also contends was preapproved,[4] by failing to give a missing witness instruction and by limiting the jury's consideration of the matter. See *Commonwealth* v. *Smith*, 49 Mass. App. Ct. 827, 832 (2000). Counsel did not seek or obtain prior approval[5] to make the missing witness argument, and by declining to interrupt defense counsel's missing witness

---

[4]Contrary to the defendant's assertion, a missing witness instruction is not required when counsel is permitted to ask the jury to draw an adverse inference from the failure to call an available witness. We have said that "the issue of a missing witness can be covered by comment of counsel in final argument, by instruction alone, or by both methods." *Commonwealth* v. *Anderson*, 411 Mass. 279, 285 (1991).

[5]The proper practice is to obtain the judge's permission to make a missing witness argument. *Commonwealth* v. *Vasquez*, 27 Mass. App. Ct. 655, 658 (1989).

argument the judge did not conclude implicitly that the foundational requirements for a missing witness instruction had been met. *Id.* at 830. Rather, the judge expressly found, albeit after closing arguments, that the defendant failed to make the requisite preliminary showing for a missing witness instruction. In addition, the judge did not limit the jury's consideration of the issue. See *id.* at 832. Indeed, by instructing the jury to draw an adverse inference against the Commonwealth from Jackson's failure to testify, without having laid a proper foundation, the defendant effectively made an argument he was not entitled to make.[6],[7] Cf. *Commonwealth* v. *Pettie*, 363 Mass. 836, 840-841 (1973) (judge sua sponte properly interrupted defense counsel's argument, which was not supported by evidence or inferences fairly drawn therefrom); *Commonwealth* v. *Edgerly*, 6 Mass. App. Ct. 241, 256-260 (1978) (conviction affirmed where, after objection, judge interrupted both defense counsel and prosecutor on multiple occasions during arguments not supported by evidence or inferences fairly drawn therefrom and specifically addressed improprieties, including prosecutor's comment concerning absent witnesses).

4. *Prosecutor's closing argument.* a. *Vouching and unsworn testimony.* Approximately two-thirds of the way into his closing argument, the prosecutor began a review of the testimony of Marcelus Durham, one of the two witnesses with whom the Commonwealth had a plea agreement,[8] as follows:

> "And I spoke with Marcelus Durham, and I looked at him, and I looked at what he had become. And you heard from him. He's been employed for two years. I suggest to you that that eight-year stint in the federal penitentiary changed his life. Changed one of the people's lives — one

---

[6]The judge stated, out of the presence of the jury, that both counsel argued the missing witness issue "effectively."

[7]Much of the confusion surrounding this issue could have been avoided by a ruling on the missing witness issue before closing arguments.

[8]Marcelus Durham agreed to testify in exchange for the Commonwealth's recommendation of no incarceration for his guilty plea on an indictment alleging conspiracy to commit murder (Gregory Cormier). Shawn Castle agreed to testify in exchange for a nolle prosequi of an indictment alleging that he murdered Gregory Cormier, and the Commonwealth's recommendation of no incarceration to his guilty plea on an indictment alleging conspiracy to commit murder (Gregory Cormier).

of the few people's lives that have been changed out of this group of Belnel Dogs I would suggest to you. And so I spoke with Marcelus Durham, saw that he was working, and I told him that if you come in and testify before the grand jury —"

He was interrupted by an objection that was sustained, and specifically warned by the judge that he confine himself to evidence presented to the jury.

Notwithstanding that admonition, when he turned to the testimony of Shawn Castle, the prosecutor said:

> "Shawn Castle, as I told you, was indicted. And after that, he decided to talk. *And I listened to Shawn Castle.* And after he told his story, I got into my car. I don't have a Mercedes, and I don't have two Lincoln Towncars. *I got into my little beat-up little car, and I drove over to Blue Hill Avenue. Just like you did* [describing how he personally traced the route Castle had described]. *I went out in the direction of Milton. Just like Shawn Castle said he did, and just like you did in that bus* [describing the route]."

He proceeded to weave a tapestry using three threads, each tracing the route Castle drove to the shooting and the route Castle drove from the shooting to Belnel Village. The first thread was Castle's testimony about the route he drove. The second was the view taken by the jury that traced the same route. The third was the route the prosecutor took, before indictment, to verify Castle's statement to him. These threads were joined together with the repeated mantra, "I went out . . . just like Shawn Castle said he did . . . just like you did." The prosecutor added that he jumped the same fence (in his suit) that Castle had said Murrell cut his hand on while jumping, and finished this substantial portion of his closing as follows:

> "*After I had been to all of those locations, I knew, and I suggest to you you know, that Shawn Castle was able to say that and tell us that because he was there. And they were there.* They were there on the tenth of June, 1994. . . .
>
> "Shawn Castle, I suggest to you, told you the truth.
>
> "*And after seeing all of those things, Shawn Castle was*

*given a deal. And the very next day you heard, the very next day, he was before the Norfolk County grand jury, and he told them what he had seen.*" (Emphasis added.)

The prosecutor's closing ended soon thereafter.

Defense counsel moved for a mistrial based on the prosecutor's treatment of Castle's testimony and the view the jury took at the beginning of the trial. Counsel for Murrell, joined by the defendant's counsel, argued that the prosecutor unfairly "put his good name to the credibility of Mr. Castle" by giving what essentially was "testimony by an individual not under oath" after previously having been "instructed to stick to the facts" that were in evidence. Counsel further argued that the manner in which it was done went beyond "personal belief," and amounted essentially to prosecutorial verification. The prosecutor contended he did nothing more than "indicate[] to the jurors that what [he] was doing was exactly what they did during the course of the view," except possibly jumping over the fence. The judge denied the motion for a mistrial, saying the prosecutor essentially was arguing what the jury saw on the view. The judge added that he thought the matter could be cured with a "standardized" instruction that he would enhance by telling the jury that "opinion or personal belief . . . *or activities* of any lawyer are not relevant." He invited counsel "to craft any other curative language . . . that indicates that the jurors [were] to stick to the evidence in the case."

The next morning, before the judge instructed the jury, both defense counsel proposed a specific curative instruction, set forth in the margin.[9] The judge declined to give the requested curative instruction and instead gave, as part of his final instruc-

---

[9]"Part of the final argument by Assistant District Attorney Nelson was improper. Mr. Nelson should not have argued to you about certain things that he says that he did. Those things were not part of the evidence, were not introduced in the evidence, were not sworn testimony, because Mr. Nelson was not called to testify and was not subject to cross-examination by defense counsel. Those same statements were comments on the credibility of a prosecution witness. And for that reason also were improper as part of the argument.

"You as jurors should totally disregard Mr. Nelson's comments regarding what he did and remember that arguments are not evidence and you may only consider the sworn testimony of witnesses and the reasonable inferences that can be drawn from their testimony when deciding where the truth lies in this case."

tions, a standard instruction concerning opening statements and closing arguments of lawyers that included the following:

> "If a lawyer made reference to a personal belief or a personal position on the evidence in this case, you must summarily reject that opinion as well. The personal beliefs or activities of any lawyer, such as personally traveling on a different occasion to the scenes you visited on the view, are not relevant. Nor may any attorney personally vouch for the credibility of any witness."

The judge also instructed the jury, conformably with *Commonwealth* v. *Ciampa*, 406 Mass. 257, 266 (1989), that, because of their plea agreements, Durham's and Castle's credibility must be evaluated with particular care, and that the government does not know whether the witness testifying pursuant to a plea agreement is telling the truth.

The issue of prosecutorial misconduct, raised in this case at the conclusion of the prosecutor's argument, was sufficiently timely to preserve the defendant's appellate rights. *Commonwealth* v. *Person*, 400 Mass. 136, 139 (1987).

The Commonwealth's response, now as at trial, that the prosecutor merely was restating what the jury saw on the view, is disingenuous. The prosecutor related what he did to satisfy himself, before indictment, that what Castle had told him was true, and on that basis he decided to seek an indictment and offer Castle a "deal." This amounted to unsworn testimony, and vouching, both of which are improper argument. See *Commonwealth* v. *Ciampa*, *supra* at 265; *Commonwealth* v. *Shelley*, 374 Mass. 466, 470, 471 (1978), *S.C.*, 381 Mass. 340 (1980). It did not end there. The prosecutor went on to offer his own decisions to indict and recommend leniency as encouragement for the jury to convict. He reassured them that the journey they shared, traveling the route Castle had described, was the basis for the decision each would have to make: "I knew, and I suggest to you you know, that Shawn Castle was able to say that and tell us that because he was there." The prosecutor effectively placed himself inside the jury box and carried the torch to the deliberation room.

Castle was the key Commonwealth witness. He alone placed

the defendant and Murrell at the scene of the shooting. His credibility was essential to the Commonwealth's case, and the prosecutor placed the full force of his office behind Castle's credibility when he stated, with no evidentiary support, that his office prosecuted this case and gave Castle a deal because he knew Castle was telling the truth.

In cases where a prosecutor improperly has given unsworn testimony that went to a critical issue in the case, or improperly has vouched for a key Commonwealth witness, where there has been an objection (and sometimes not), and where the case against the defendant is not otherwise overwhelming (as here), we have required a judge to respond to prosecutorial misconduct with force and specificity. A general instruction, as here, will not suffice to neutralize the prejudice. *Commonwealth* v. *Shelley*, *supra* at 469-472. See *Commonwealth* v. *Santiago*, 425 Mass. 491, 501 (1997), *S.C.*, 427 Mass. 298, and 428 Mass. 39, cert. denied, 525 U.S. 1003 (1998); *Commonwealth* v. *Person*, *supra* at 142-143; *Commonwealth* v. *Redmond*, 370 Mass. 591, 594-597 (1976). A new trial is required.[10]

There were other instances of improper argument that certainly contributed to the prejudice to the defendant, but this transgression alone warrants a new trial. We now turn to the other aspects of the prosecutor's closing argument.

b. *Other portions of the prosecutor's closing.* Contrary to the defendant's assertion, the prosecutor did not insinuate that the defendant was not entitled to the presumption of innocence when he suggested that the angel on the defendant's shoulder, defense counsel's metaphor for the presumption of innocence, had flown away long ago. A jury would readily recognize that this was nothing more than verbal jousting. The absence of an objection

---

[10]The prosecutor who tried the case was an experienced member of the district attorney's staff. To say that he knew or certainly should have known better than to offer the wholly improper argument is a gross understatement. Gregory Cormier was murdered almost fourteen years ago. The prosecutor's unnecessary conduct is the sole cause of the need for a new trial at great expense to the Commonwealth and great anguish to Cormier's family.

The judge should have interrupted the prosecutor when he began giving unsworn testimony and vouching for Castle's testimony, especially where he had sustained an objection and warned the prosecutor seconds earlier as to similar misconduct with respect to the testimony of Durham. A curative instruction at that point might have gone a long way to cure this particular prejudice.

from experienced defense counsel suggests there was nothing really unfairly prejudicial about the comment. *Commonwealth* v. *Toro*, 395 Mass. 354, 359-360 (1985).

There was nothing improper about the prosecutor's remark that "Belnel Village, in 1994, was hell." There is ample support for the statement in the record. The evidence indicated that Ato Murrell and another teenager were shot and killed in the streets of this neighborhood just five days before Cormier was killed. There was evidence of significant use of guns by rival gangs and evidence of an atmosphere of violence that enshrouded Belnel Village. See *Commonwealth* v. *Anderson*, 411 Mass. 279, 285-287 (1991) (reference to prison as "sewer" permissible as "dramatic flourish" supported by record).

The prosecutor's parting words to the jury were, "It is your turn to put in work." That particular phrase ("put in work") was one used by the Belnel Dogs to signify a revenge killing. There was no objection from defense counsel. The remark improperly urged the jury to do something beyond impartial fact finding. See *Commonwealth* v. *Worcester*, 44 Mass. App. Ct. 258, 264 (1998) (judgment reversed where prosecutor asked jury "to do something about" killing). It should not be used at retrial.

There was an objection to the prosecutor's statement that "Shawn Castle talked to Lieutenant Nolan on two occasions in 1995. And he told you at that time when he was talking to Lieutenant Nolan, he was in fear for his life. I suggest to you, ladies and gentlemen, that Wayne Jackson, Gregory Cormier's cousin, is in the same position." The objection was overruled. The defendant argues that the prosecutor improperly argued, without foundation, that Jackson feared testifying against the defendant. We agree. The Commonwealth argues that this was fair rebuttal to the defendant's missing witness argument. It was not fair rebuttal. The proper response to the defendant's missing witness argument would have been an objection, for reasons discussed above (lack of foundation). Alternatively, the missing witness issue should have been discussed before closing arguments, the preferred practice. See *Commonwealth* v. *Earltop*, 372 Mass. 199, 206-207 (1977) (Hennessey, C.J., concurring); *Commonwealth* v. *Smith*, 49 Mass. App. Ct. 827, 830 (2000); *Commonwealth* v. *Vasquez*, 27 Mass. App. Ct. 655, 658 (1989).

Although it reasonably could be inferred that Jackson's absence and refusal to disclose his whereabouts could be attributed to fear, there is nothing in the record to indicate whom he feared or why. There was no basis for the prosecutor to make this argument, because its evident implication was that Jackson was in justifiable fear of the defendant (and Murrell), and the objection should have been sustained. This issue can be addressed at the new trial.

For the foregoing reasons, the judgments are reversed, the verdicts are set aside, and the case is remanded to the Superior Court for a new trial.

*So ordered.*