Commonwealth v. Fernandes.

COMMONWEALTH vs. ERNEST FERNANDES.

Plymouth. December 9, 1997. - March 16, 1998.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, FRIED, MARSHALL, & IRELAND, JJ.

*Homicide. Malice. Practice, Criminal,* Instructions to jury, Capital case. *Joint Enterprise. Evidence,* Hearsay, Joint enterprise, Consciousness of guilt, State of mind, Relevancy and materiality, Admissions and confessions. *Constitutional Law,* Admissions and confessions.

At the trial of an indictment for murder in the first degree, the judge correctly instructed the jury on the relevant first two prongs of malice. [92]

At a murder trial prosecuted on a theory of joint venture, the jury should have been instructed not to consider out-of-court statements of alleged joint venturers unless it was established by nonhearsay evidence that a joint venture involving the defendant existed; however, in light of the abundant evidence of the defendant's own conduct and statements supporting the conclusion that he was so involved, no substantial likelihood of a miscarriage of justice was created by the absence of the instruction. [92-93]

At a murder trial, statements the defendant made to a coventurer after the killing were properly admitted as evidence of consciousness of guilt. [93-94]

At a murder trial, the judge properly admitted a witness's testimony that he observed a coventurer and the victim arguing about two weeks before the killing. [94]

At a murder trial, a coventurer's threat to kill the victim was properly admitted to demonstrate the coventurer's state of mind at the time and that he carried out his intent, and that the statement was made one week before the killing did not render the statement too remote to be relevant. [94-95]

At the trial of a first degree murder indictment on a theory of joint venture the judge correctly excluded on relevancy grounds evidence proffered by the defendant tending to show that the defendant did not shoot the victim [95-96], and the defendant's right to present a defense was not thereby harmed [97].

Certain hearsay evidence proffered by a criminal defendant, properly excluded as irrelevant to the issues in the case, was not admissible as of right to impeach the credibility of another witness. [97]

No substantial likelihood of a miscarriage of justice was created by the admission of a defendant's electronically unrecorded inculpatory statements made to a State trooper while the defendant was detained in a correctional facility on unrelated charges. [97-98]

INDICTMENT found and returned in the Superior Court Department on July 21, 1992.

The case was tried before *John A. Tierney*, J.

*Richard L. Goldman* for the defendant.

*John E. Bradley*, Assistant District Attorney, for the Commonwealth.

ABRAMS, J. The defendant, Ernest Fernandes, known as "Lucky," appeals from his conviction of murder in the first degree by reason of deliberate premeditation. He was prosecuted on the theory of joint venture. He argues that the judge erred in his instructions to the jury and in certain evidentiary rulings. He also urges us to establish a rule requiring that inculpatory statements made by an incarcerated person during police interrogation be electronically recorded. We affirm the conviction and decline to exercise our power to reduce the verdict or order a new trial. See G. L. c. 278, § 33E.

The jury would have been warranted in finding the following facts. The defendant and several other men, including Stephen "Stix" Fernandes,[1] Jordan Martel Rice, Tim Lucas, Karl Moore, and others, went to a party in a Brockton home on the night of November 2, 1991. The defendant and a few of the others were seen carrying guns. Stix remarked that he was "sick of" the victim, Chris Bender, because the victim "had pulled a gun on him." Stix said he wanted to go to the east side of Brockton and "[w]et them bitches up," meaning that he wanted to kill the victim and his cousin, Jesse Starks.

In the early morning hours of November 3, the group, totaling ten, went in two cars to a housing project on the east side of Brockton. During the ride, the defendant and Moore loaded their guns while discussing their concerns about leaving fingerprints on the bullets. While the two drivers waited near the automobiles, the others, including Stix and the defendant, walked into the project, where they found the victim and Starks smoking marihuana in an automobile. They began shooting at the automobile, killing the victim. Starks was not harmed. The shooters ran back to the waiting automobiles immediately after the shots were fired and drove away.

---

[1] It is unclear whether Stephen "Stix" Fernandes and the defendant are related. At oral argument, we were advised that they may be cousins. We will refer to Stephen Fernandes as Stix to avoid confusion with the defendant. At a separate trial, Stix was convicted of murder in the first degree, and we affirmed the conviction. *Commonwealth* v. *Fernandes*, 425 Mass. 357 (1997). Several of the other men were convicted of murder in the second degree, and their appeals are pending before the Appeals Court.

The group drove to a convenience store. En route, the defendant asked, "Whose car was that?" Someone told him it was the victim's, to which the defendant replied, "Well, then, [the victim] got his." The defendant, who was holding some shell casings, expressed concern that his fingerprints might be on them. He also said that he wanted to wash gunpowder off his hands. When they arrived at the store, a police cruiser sped by with its lights and siren activated. The defendant told the others not to worry because no one had seen their faces, and that nobody knew his face because he was from Boston.

At the scene, police recovered spent shell casings and projectiles. It was determined that at least three guns were used in the shooting: two nine millimeter handguns and a .22 caliber handgun.

The day after the murder, the group met in Kevin Bynum's bedroom. The defendant attended this meeting, but apparently did not say anything. Bynum's roommate, William Faria, who was not involved in the shooting, tried to join them but was kept out of the bedroom. From the living room, he was able to overhear the group's discussion about the previous night. Lucas told the others to blame the shooting on some people from Boston. Stix mentioned that Lucas's girl friend was complaining about guns being in her house. Stix and Lucas suggested either dumping the guns in a river or taking them to Providence. The meeting ended when Stix and Lucas left to retrieve the guns.

1. The defendant argues that the judge improperly instructed the jurors on the third prong of malice by stating that they could convict if they found that he acted with the specific intent to do grievous bodily harm. This contention is wrong for two reasons. First, the intent to do grievous bodily harm is not third prong malice, but second prong malice. Indeed, the judge did not instruct the jury on third prong malice at all, but only on the first two prongs. Second, third prong malice is not relevant to a theory of deliberate premeditation, which requires the specific intent to kill. See *Commonwealth* v. *Judge*, 420 Mass. 433, 441-442 (1995). The instruction on murder in the first degree made it clear to the jurors that they could only convict the defendant if they found that he acted with the intent to kill and with deliberate premeditation.

2. The defendant also argues that the judge improperly instructed the jurors on the joint venturer exception to the

hearsay rule by failing to instruct them not to consider the out-of-court statements of alleged joint venturers unless it was established by nonhearsay evidence that there was a joint venture involving the defendant. See *Commonwealth* v. *Nascimento*, 421 Mass. 677, 680-681 (1996). Out-of-court statements admitted at trial included (1) a threat made by Stix to the victim and Starks before the shooting, discussed *infra*; (2) statements made by the other men at the party; and (3) statements made by the other men after the shooting concerning the concealment of the crime. Because the defendant did not object to the instruction at trial, we review for a substantial likelihood of a miscarriage of justice.

The instruction was flawed. We adhere to the rule that an out-of-court statement, offered for its truth on the theory that the statement was made in furtherance of a joint venture between the defendant and the declarant, is inadmissible absent independent evidence that a joint venture existed. The jury should have been so instructed. See *id.* at 681.

However, the defendant did not request such an instruction, and he has not shown that its absence resulted in a substantial likelihood of a miscarriage of justice. There was abundant evidence relating to the defendant's own conduct and statements, for example, that (1) he and the other young men went to the party together, all carrying guns; (2) he rode with the group to the east side of Brockton; (3) on the way, he and another young man loaded their guns; (4) when the cars stopped, he went with the larger part of the group into the project; (5) he came running back with them immediately after shots were fired; and (6) he attended the meeting the next day where the group determined to conceal its involvement in the killing. All these facts support the conclusion that he was involved in a joint venture. In these circumstances, there was no substantial likelihood of a miscarriage of justice.

3. Some time after the murder, the defendant encountered one of the coventurers, Jordan Martel Rice. The defendant told Rice that another coventurer, Tim Lucas, had been "shooting off his mouth about how [the victim] got killed." Rice testified that the defendant said that "he wanted to . . . kill [Lucas] so he would stop talking." According to Rice's testimony, the defendant also said that he did not want to go to jail. The defendant now argues that the statements should have been excluded as a subsequent bad act offered to show bad character or criminal propensity.

The Commonwealth counters that his statements are admissible as evidence of consciousness of guilt. We agree with the Commonwealth.

Evidence showing consciousness of guilt, such as a threat to kill a potential witness, is admissible to prove that a defendant committed the crime charged, even if it tends to indicate that the defendant committed or planned to commit another offense. See *Commonwealth* v. *Miles*, 420 Mass. 67, 75 (1995); *Commonwealth* v. *Roberts*, 378 Mass. 116, 125 (1979). The statements that the defendant "didn't want to go to jail" and that he wanted to kill Lucas for talking establish his consciousness of guilt. They were not offered to prove anything about the defendant's character. The judge properly admitted these statements.[2]

4. Over the defendant's objection, Jesse Starks testified that about two weeks before the murder, Stix and the victim were involved in an argument outside a restaurant in Brockton across the street from the victim's home. The defendant was not involved in this incident. Starks characterized the incident as an argument but did not testify as to the content of the argument. The judge properly admitted this testimony as merely a shorthand expression to describe what Starks had seen. Cf. *Commonwealth* v. *Olszewski*, 401 Mass. 749, 759 (1988), *S.C.*, 416 Mass. 707 (1993), cert. denied, 513 U.S. 835 (1994). Also, it was within the judge's discretion to determine that the statement's probative value was not substantially outweighed by its prejudicial effect. See, e.g., *Commonwealth* v. *Fallon*, 423 Mass. 92, 97 (1996), and cases cited.

Starks also testified, again over the defendant's objection, that about one week before the murder, Stix had threatened to "get" Starks and his cousin, the victim. Kevin Bynum and William Faria were also involved in this incident, but the defendant was not. The defendant argues that Starks's testimony was inadmissible hearsay and that it improperly imputes Stix's motives to the defendant. The Commonwealth, while conceding that the joint venturer exception to the hearsay rule does not apply to the threat because no joint venture involving the defendant existed at the time, argues that the threat is nonetheless admissible as showing Stix's state of mind or present intent. The Commonwealth also argues that the threat was relevant on

---

[2] The statements were also admissible as admissions. The Commonwealth has not so argued, however, so we do not discuss this issue.

the issues of the motive for the killing and the defendant's state of mind as a joint venturer.

"[A] declaration of intention, offered to prove the declarant's state of mind, then and later . . . is not excluded by the hearsay rule; either it is not hearsay, or it is within an exception to the hearsay rule." *Commonwealth* v. *Wampler*, 369 Mass. 121, 123 (1975), citing *Commonwealth* v. *DelValle*, 351 Mass. 489, 491-492 (1966). A declarant's threat to "get" or kill someone is admissible to show that the declarant had a particular state of mind and that he carried out his intent. See *Commonwealth* v. *Stewart*, 411 Mass. 345, 355-356 (1991) (rejecting defendant's proffered state of mind evidence where it was offered to prove only that he had an intent, and not that he carried it out); *Commonwealth* v. *Lowe*, 391 Mass. 97, 105-106, cert. denied, 469 U.S. 840 (1984). Stix's threat against Starks and his cousin showed Stix's state of mind at the time and was admissible to show that Stix carried out his intent. Rather than imputing this state of mind to the defendant, the threat put the killing into the context of a narrative that was comprehensible to the jury and was relevant to the purpose of the joint venture. Cf. *Wampler*, *supra* at 123 (allowing in evidence statement made out of the presence of the defendant to help the jury understand the declarant's later statements to the defendant).

*Wampler* is a very similar case. In both *Wampler* and the present case, the declarant had a previous altercation with the murder victim. Out of the presence of the defendant, the declarant expressed an intent to kill the victim. Shortly thereafter, the defendant and the declarant, joining forces, killed the victim. In *Wampler*, these facts occurred over two days. In this case, the statement of intent to kill came about a week before the murder. Finally, any prejudicial effect Stix's statement may have had was mitigated by the fact that, according to one witness, Stix said it again at the party. We cannot say that, as a matter of law, this lapse of one week rendered the statement too remote to be relevant. There was no error.

5. On cross-examination of Faria, who testified for the Commonwealth, the defendant sought to elicit testimony about what Karl Moore had said to Faria shortly after the killing. The Commonwealth objected on hearsay grounds. After a sidebar conference, the judge determined that this testimony would have been relevant, if at all, to show that the defendant did not actually shoot the victim. Reasoning that this was immaterial in a joint

venture case, the judge excluded the testimony. The defendant argues that the exclusion was improper in that (1) the testimony was admissible as substantive evidence, (2) the exclusion impermissibly restricted his right to present a defense, and (3) the testimony reflected on another witness's credibility. We disagree as to all points.

At the outset, we note that it is unclear how Faria would have testified had he been permitted to do so. According to a statement given by Faria to the police, however, Moore had roused him from sleep in the early morning hours, told him that he (Moore) had killed the victim, and named several other participants as shooters, but "Faria could not remember what and if Moore may have told him about Lucky." Both the defendant and the Commonwealth appear to assume that Faria's testimony would have been identical to his statement to the police. They do not suggest that, at trial, Faria might have remembered more details of Moore's statement to him. We therefore assume that Faria would have testified that he could not remember what, if anything, Moore may have told him about "Lucky."

The trial judge has discretion to determine whether evidence is relevant. See *Commonwealth* v. *Dunn*, 407 Mass. 798, 807 (1990). We do not overturn the judge's decision absent palpable error. *Id.* The judge correctly reasoned that once the defendant's involvement in a joint venture is established, it is immaterial which bullets actually struck the victim or whether the defendant fired at all. Further, Faria's failure to recall what, if anything, Moore may have said about the defendant does not show that the defendant was not involved at all. The judge properly exercised his discretion to exclude Faria's testimony as to his own lack of memory. See *Commonwealth* v. *Bui*, 419 Mass. 392, 400-401, cert. denied, 516 U.S. 861 (1995). See also *Commonwealth* v. *Fordham*, 417 Mass. 10, 19-20 (1994) ("a defendant must show a reasonable likelihood that, had the cross-examination been permitted to continue without interruption, testimony of more than minimal value to the defendant might have been forthcoming"). Cf. *Commonwealth* v. *Lopez*, 426 Mass. 657, 665 (1998), quoting *Commonwealth* v. *Duest*, 30 Mass. App. Ct. 623, 628 (1991) (" '[A] want of recollection of a fact . . . cannot be a reasonable ground for granting a new trial,' for it 'may always be pretended, and may be hard to be disproved' "). There was no error in concluding that the proffered testimony was irrelevant.

For similar reasons, the defendant's right to present a defense was not harmed. The defendant claims that Faria's testimony would have corroborated the fact that the Commonwealth could not prove that a bullet from his gun struck the victim. Because it is irrelevant in a joint venture whether a bullet from the defendant's gun struck the victim, the defendant has not shown a reasonable likelihood that Faria's testimony would have been of more than minimal value to him. See *Fordham, supra.* Therefore, the judge did not violate the defendant's right to present a defense.

Finally, the defendant contends that Faria's testimony would have reflected on the credibility of Jordan Martel Rice, who testified for the Commonwealth under a grant of immunity. This is not a case of impeachment by the witness's own prior inconsistent statements, but impeachment by *another* witness's allegedly inconsistent statements. Although a judge may, in his or her discretion, admit such extrinsic evidence, the evidence is not admissible as of right. See, e.g., *Commonwealth* v. *Zezima*, 365 Mass. 238, 242 n.5 (1974). "Where the matter is relevant to an issue in the lawsuit and not merely to the credibility of the witness, extrinsic proof can always be offered to contradict." P.J. Liacos, Massachusetts Evidence § 6.6.1, at 268 (6th ed. 1994), citing *Hathaway* v. *Crocker*, 7 Met. 262, 266 (1843). However, as explained above, the judge properly excluded the proffered testimony as irrelevant to the substantive issues in the case. There was no error.

6. Prior to his indictment, the defendant was detained in a Rhode Island correctional facility on unrelated charges. A Massachusetts State trooper interviewed him there, and he made inculpatory statements about his involvement in the shooting. The statements were not electronically recorded, and there was no written record of either Miranda warnings or the defendant's waiver thereof.

The defendant brought a motion in limine to suppress the statements. At the hearing on the motion, the defendant testified that he had not been advised of his rights and that he did not sign a waiver card. The State trooper admitted that he did not use a card or form but testified that he did advise the defendant of his rights. The judge denied the motion in limine, implicitly finding that Miranda warnings were administered and that the statements were voluntary. When the Commonwealth introduced the statements at trial, the defendant did not object.

For the first time, the defendant argues that the officer should have electronically recorded the statements. To date, we have not imposed a requirement that statements to police be electronically recorded, see *Commonwealth* v. *Diaz*, 422 Mass. 269, 273 (1996); *Commonwealth* v. *Fryar*, 414 Mass. 732, 742 n.8 (1993), *S.C.*, 425 Mass. 237, cert. denied, 118 S. Ct. 636 (1997), although we have suggested that at some time, such a requirement may become appropriate. *Diaz, supra* at 272-273. The defendant urges us to hold that the time has come to impose this requirement, at least when the police interrogate a person who is incarcerated.[3]

The defendant does not expressly argue to us that the statements should have been suppressed. He argues only that the statements should have been recorded. Nevertheless, because we assume he is seeking relief for himself rather than merely an announcement of a new rule of law, we treat his argument as an appeal from the admission of the statements. Accordingly, we review for a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Keniston*, 423 Mass. 304, 308 (1996), quoting *Commonwealth* v. *Boyer*, 400 Mass. 52, 57 (1987) (unsuccessful motion in limine, without an objection at trial, does not preserve defendant's rights).

The defendant argues that a recording requirement would protect defendants' rights and eliminate the need for hearings such as the one that took place in this case. Such documentary proof that Miranda warnings were administered and waived could be obtained, perhaps more economically, through the consistent use of written warnings and waivers. In addition, the defendant does not now contend that his statements were involuntary or the result of police coercion. The only alleged defect to which he points is the mere lack of an electronic recording. Finally, he has established neither a meaningful distinction between his case and *Diaz, supra*, nor prejudice resulting from the admission of his statements. In these circumstances, while we still appreciate the advantages of electronic recording, see *Diaz, supra* at 272-273, we conclude that there was no substantial likelihood of a miscarriage of justice in failing to record the defendant's statements or in admitting the unrecorded statements.

7. We have reviewed the entire record and conclude that the

[3]In any event, we would not make such a rule retroactive, and would set an effective date in the future for any such rule.

verdict was consonant with justice. Accordingly, we decline to exercise our power pursuant to G. L. c. 278, § 33E, to reduce the verdict or order a new trial.

*Judgment affirmed.*