GAZIANO, J.
**269 On January 10, 2009, Robert Gonzalez was shot and killed while he was sitting in his parked Dodge Caravan minivan on a side street in Lawrence. In September 2013, the defendant was convicted of murder in the first degree, as a joint venturer, on a theory of deliberate premeditation in the shooting.[1]
In this direct appeal, the defendant primarily challenges the sufficiency of the evidence that he was present at the scene, knowingly participated in the shooting, and had the mental state necessary to the offense. He argues also that the trial judge abused her discretion in allowing the admission of opinion testimony by a cellular telephone company employee who was not an engineer, but who interpreted cell site location information (CSLI) gleaned from the defendant's and his friends' cellular telephones, because the witness was not qualified to render an expert opinion on certain topics. In addition, the defendant challenges the judge's decision to allow the admission of a video recording comparing images from surveillance footage of the vehicle that dropped off the shooters and *948 images of a Dodge Caravan that investigators had seized from the defendant's girl friend's mother and that the defendant and his girl friend often used. Lastly, the defendant asserts that the presence of a key prosecution witness, a State trooper, at counsel table throughout the trial, until he testified as the Commonwealth's final witness, improperly vouched for the **270 credibility of his testimony and requires a new trial. The defendant also asks us to exercise our extraordinary power under G. L. c. 278, § 33E, to order a new trial or to reduce the verdict to a lesser degree of guilt. For the reasons that follow, we affirm the conviction and decline to exercise our authority to grant relief under G. L. c. 278, § 33E.
1. Facts. We recite the facts the jury could have found, viewing them in the light most favorable to the Commonwealth, see Commonwealth v. Latimore, 378 Mass. 671, 677, 393 N.E.2d 370 (1979), and reserving some details for later discussion.
a. Background. The Commonwealth's theory at trial was that the defendant and his friends planned and carried out the shooting in retaliation for a fight in which the victim punched out the defendant's tooth. The dispute between the victim and the defendant that led to the fight arose over an unpaid debt that the victim owed Cauris Gonzalez,[2] the defendant's then girl friend, for a Honda Civic hatchback automobile that he had purchased from her in the summer of 2008. By January of 2009, he had paid most of the cost of the vehicle, but still owed Cauris one hundred dollars. Although the victim had not paid the full purchase price for the Honda Civic, by January 2009, he had sold it and had used the proceeds to purchase a Dodge Caravan minivan.
b. Evening before and day of the shooting. At approximately 6 P.M. on January 9, 2009, Cauris telephoned the victim and asked him to pay her the remaining one hundred dollars for the Honda Civic she had sold him. The victim said that he did not have the money. Using his own cellular telephone, the defendant then called the victim and got into an argument with him when the defendant asked him to pay Cauris and the victim said that he was not going to give the defendant any money.
Sometime between 7 or 8 P.M. that evening, the defendant and Cauris went to a party that was being hosted by several of the defendant's friends at their house on Essex Street. At around 11 P.M. , the defendant, Cauris, and the defendant's friend Yoshio Stackerman left to get some food at a nearby fast food restaurant. They were expected to return to the party but did not; there was no evidence to establish where they went after leaving the house on Essex Street, until approximately 2 A.M. on January 10, 2009.
At that point, the defendant and Cauris were waiting in the drive-through lane at the same fast food restaurant. Cauris was driving **271 her mother's Dodge Caravan minivan, and the defendant was standing next to the vehicle. Stackerman was not with them. The victim and three friends drove past the restaurant, in the victim's Dodge Caravan. When the victim saw the defendant and Cauris, he began yelling through the window of his vehicle, and the defendant began yelling back about the money the victim owed Cauris. Immediately before the victim and his friends reached the restaurant, the victim, who seemed very angry, had been yelling at someone on his cellular telephone. Call logs from the victim's and the defendant's cellular telephones showed three calls between those *949 two numbers at approximately the same time, one at 2:12 A.M. and two at approximately 2:17 A.M.
The victim and his friends got out of his Dodge Caravan; the friends stood near the vehicle, about twenty to thirty feet away, and the victim headed toward the defendant. The defendant then pulled out a knife and "waved it around," but did not lunge toward anyone. Both men were yelling and "screaming." The defendant said, "Bitch ass nigger. You gonna snuff me, bitch ass nigger?" The victim, who was much larger and taller than the defendant, responded, "I don't want to hit you," then punched the defendant in the mouth, knocking out one of his teeth. The defendant spit out his tooth and began spitting blood toward the victim. One of the victim's friends picked up the tooth and "started showing it like it was funny."
The victim began to walk back toward his minivan, and the defendant followed, "screaming." The defendant then threw his cellular telephone at the victim. The telephone missed the victim, and broke when it hit the ground. The defendant was still yelling at the victim when Cauris drove up in her mother's minivan and told the defendant to get in. As the defendant was stepping into the minivan, he said to the victim, "Fuck you. It's not going to stay like this." The defendant and Cauris drove off, leaving the broken cellular telephone on the ground. Each returned to their parents' houses, from where they spent the night talking to each other on the telephone.[3]
At around noon that day, the defendant and Cauris went to a pharmacy to get medication for the defendant's mouth, which was swollen but no longer bleeding; Cauris was driving her mother's minivan. In the early afternoon of January 10, 2009, the victim and three of his friends drove to the defendant's parents'
**272 house. The defendant and Cauris returned from their trip to the pharmacy at approximately the same time. Cauris got out of her minivan and walked up to the front door while the defendant drove away. When the defendant's mother answered, she saw a man she did not know -- the victim -- standing across the street, near a minivan. He told her that he had the defendant's tooth and would sell it to her for "a thousand bucks." He then entered his minivan and drove away; the defendant, who had been watching from a distance, returned to the house. Sometime between 3:30 and 4 P.M. , the defendant and Cauris drove his mother to work in Cauris's mother's minivan.[4]
The Commonwealth relied extensively on telephone records and CSLI as circumstantial evidence of the location of the defendant, Cauris, and the defendant's friends in the hours before the shooting, and to show that all five had participated in planning the shooting, then stopped calling each other during the fifteen minutes immediately prior to the shooting, which occurred shortly before 6 P.M. [5]
*950 Call records and testimony were also introduced concerning calls on the day of the shooting between Cauris and her brother's then girl friend, Ashley Calisto, who had had surgery approximately one week earlier. Telephone records showed that Cauris's telephone number called Calisto's telephone number at 1:40 P.M. ; Cauris told police she had called to ask if she and the defendant could come by to visit Calisto that evening. Telephone records also indicated that Cauris's telephone called Calisto's telephone number again at approximately 5:45 P.M. Calisto testified to receiving a call from Cauris at around that time.
Eight calls were made during the afternoon between the telephone numbers being used by the defendant and Cauris, Stackerman, Castro, and Wyatt; these telephone numbers also made calls to other numbers. No calls were made from any of the four numbers between about 5:45 P.M. and 6:01 P.M. Minutes after the shooting, at 6:01 P.M. , Cauris's telephone called Castro's telephone **273 number twice. Also at 6:01 P.M. , Castro called for a taxicab and asked to be picked up at a location approximately two blocks from the scene of the shooting, while Cauris's telephone called Calisto's telephone three times shortly after the shooting, between 6:02 and 6:06 P.M.
Calisto testified that the defendant and Cauris arrived at her house at "6:15/6:10/6:20-ish." Calisto had just had surgery and Cauris had spoken with Calisto earlier that day to plan a visit. After about twenty minutes, Cauris left to pick up her mother at work, while the defendant stayed with Calisto. Cauris returned to Calisto's house at around 8 P.M. ; Cauris and the defendant left together at around 9 P.M. The Commonwealth argued that the calls to Calisto indicated that Cauris and the defendant had planned their visit specifically to create an alibi for the time of the shooting.
c. The shooting. The shooting and the events immediately preceding it were video recorded by four surveillance cameras mounted on a private house in Lawrence. Two of the cameras produced images that were dark but had relatively clear footage; two other cameras, which faced the area where the victim's vehicle was parked, produced images of very poor quality. A composite from the four cameras, enhanced as far as possible, was created and played for the jury, then introduced as an exhibit.
The surveillance footage shows the victim's Dodge Caravan minivan driving north on Hampton Street at approximately 5:57 P.M. [6] and parking on that street near an intersection, on the side of the street opposite the house. It is not possible to determine from the surveillance footage who was driving; the position of the victim when he was found, and testimony at trial, established that the victim had been the driver. There were two passengers, also not visible in the video footage, one in the front passenger's seat and one in the rear seat. After the minivan stopped, an individual got out on the passenger side and entered one of the buildings.[7]
Another minivan came into view approximately twenty seconds later, driving along Haverhill Street. It stopped and four people got out. They walked across the street toward the victim's Dodge Caravan as the other vehicle drove away. The vehicle turned right onto a side street, turned *951 around, and returned to Haverhill **274 Street, driving out of view of the cameras in the same direction that it had been heading.
Two of the individuals who had crossed the street toward the victim's minivan walked behind and to the right of his vehicle, and two went to the left. The video footage shows the victim's vehicle lurch forward and slide so that it was positioned diagonally across the road, while a pedestrian ducked. The four individuals ran from the scene, heading away from Haverhill Street and out of sight of the surveillance cameras. A person got out of the rear passenger's side of the victim's minivan and entered the front seat.
The passenger called 911 at 5:59 P.M. and attempted to help the victim until emergency aid arrived. Another call was made at close to the same time by a different individual. The first officer on the scene arrived within minutes, because he had been only a few blocks away when the call went out. The victim was conscious when the officer arrived, and he responded to the officer's question about what had happened by saying that he knew "who it was." He then lost consciousness. He was transported to a local hospital and was pronounced dead. An autopsy showed that the victim has been shot twice in the back, and that one of the bullets had lodged in his spinal column and another had pierced his heart. Either bullet would have been fatal within a short time.
d. Investigation. Numerous spent cartridge casings were found near the victim's vehicle. A ballistician examined them and determined that they had been shot from two different guns. There were six .45 caliber cartridge casings, near the rear of the victim's minivan, on the passenger's side; all had been fired from one semiautomatic weapon. There also were six .357 caliber cartridge casings, all of which had been fired from a single weapon, near the rear of the victim's minivan on the driver's side.[8]
A few days after the shooting, when Lawrence police officers learned that the defendant had been involved in some kind of dispute with the victim, investigators went to the defendant's **275 parents' house intending to interview him. His father contacted the defendant by cellular telephone, and the defendant and Cauris came to the house within minutes of the call.[9] As he walked into the house, the defendant asked the officers whether they were there because of "the fight." The defendant and Cauris both agreed to go to the police station to speak with investigators. The defendant went with his father and was interviewed by Lieutenant Norman Zuk and Detective Carlos Cuevas.
The defendant waived his Miranda rights and agreed to the interview being recorded. With the defendant's assent, officers also photographed the defendant's mouth and the area of the missing tooth.
*952 The photograph and a video recording of the interview were introduced at trial. The defendant described the incident at the fast food restaurant. He told the officers that during an argument over the money the victim owed Cauris, his tooth had been knocked out with a pipe. He said that the victim and his friends had taken his cellular telephone and that, in response, he had thrown a knife at the victim but had missed. He did not mention throwing his cellular telephone. The defendant also told the officers that the victim had offered to sell his tooth to his mother, but he denied that he would have killed the victim over it. The defendant insisted repeatedly that he did not care about the tooth being knocked out, because he "was going to buy another tooth anyways."
The defendant denied killing the victim but said that he understood when the officers asked whether he knew why the fight would make him appear to be a primary suspect. He said that he had been staying at Cauris's house on his mother's suggestion, because there had been people at his house looking for him; he had heard that some people believed he had had something to do with the shooting because of the fight. When asked where he was between 5 and 8 P.M. on January 10, 2009, the defendant said that he had been at Calisto's house from 5 P.M. onwards. The defendant reiterated a number of times that he had been at Calisto's parents' house with Cauris at the time of the shooting, as the officers reposed the question and suggested that perhaps he had arrived later. He was sure that he had arrived no later than 5 P.M. , and that it could not have been around 6 P.M.
**276 The officers also asked several questions about who the defendant's friends were and who he would "hang out" with. The defendant mentioned the names "P Rock" (Pedro), "T" ("Torture"), "D Money" (Danny), and Georgie, as well as a "Puerto Rican cli[que]" whose names he did not know but who tended to socialize in a particular alley that he sometimes visited. The defendant did not mention Stackerman, Wyatt, or Castro, and initially denied knowing the name of the victim. He said that he knew the name of a friend of the victim, "Diddy." The defendant claimed at first not to recognize a telephone number that appeared in call records as having called his cellular telephone, and that was listed in T-Mobile records as registered under his name. He then indicated that he remembered having acquired an additional telephone for Cauris's brother, Ricard. Later investigation determined that the cellular telephone was being used by Stackerman.
On February 19, 2009, State police Trooper Joshua Ulrich recreated the path of the unknown vehicle seen in the home surveillance footage, by driving Cauris's mother's minivan, which had been seized from her mother's workplace. He attempted to replicate the lighting conditions of January 10, 2009, and drove according to the directions of another officer so that he could "copy the pattern that the suspect vehicle had executed." The footage of this "reenactment" was then combined with another video recording. Images of Cauris's mother's minivan were overlaid on images from the unknown vehicle in the surveillance footage, so that two vehicles could be compared to each other.
At the end of January 2009, the defendant's mother bought airplane tickets for the defendant and Cauris to travel to the Dominican Republic, so that he could have the missing tooth replaced with an implant. The defendant told police during his interview that he had contacted his dentist in the United States and the dentist had told him an implant would cost approximately $3,000 because the defendant did *953 not have insurance; in the Dominican Republic, the cost was approximately one hundred dollars. The defendant remained in the Dominican Republic until September 2009, working on his family's farm, and then returned to Massachusetts.
In June 2011, the defendant was indicted on a charge of murder in the first degree. When the defendant learned that a warrant for his arrest had issued, he went to the Provincetown police headquarters on July 6, 2011, and turned himself in.
e. Trial proceedings. The defendant's first trial, from June 10 through June 21, 2013, resulted in a mistrial when the jury were **277 unable to reach a verdict. A second trial, before a different Superior Court judge, was conducted from August 22 to September 9, 2013. The Commonwealth proceeded on a theory of deliberate premeditation by joint venture, and argued that the defendant had been a joint venturer with Cauris, Stackerman, Wyatt, and Castro. The Commonwealth did not argue that the defendant had been one of the shooters.
The Commonwealth relied extensively on cellular telephone records and CSLI data in its case-in-chief. These records were the same as those that had been introduced at Cauris's trial a few weeks previously, and were explained by the same T-Mobile employee, Raymond MacDonald, who was a manager in the law enforcement relations group and a certified keeper of the records. MacDonald testified over objection concerning CSLI data that was obtained from T-Mobile records for Cauris's cellular telephone number. The defendant challenged MacDonald's qualifications to testify as an expert after MacDonald agreed that he was not an engineer, had not been specifically trained in cellular telephone technology, and was unable to conduct many of the tests that engineers would be able to do, such as determining the strength of a particular tower signal. The objection was overruled.
MacDonald then opined, over objection, that "[t]ypically, the phone is going to connect to a cell site that is the closest cell site," but also testified that a cellular telephone could connect to a site that is farther away if, for example, the signal were stronger or the tower less busy, or there were obstacles such as hills or buildings in between. He indicated that signal strength could vary based on a number of factors, including the amount of voice traffic, the proximity of other cellular towers, the time of year, weather, and obstructions such as hills and buildings. Finally, MacDonald testified, again over objection, that he would not have expected a call made from Calisto's house to connect from the cellular tower that had transmitted two of the calls to Castro's telephone number from Cauris's number, within ten minutes after the shooting.
Maps and charts introduced at trial, as well as MacDonald's testimony, showed that Cauris's parents' house was 1.5 miles from the scene of the shooting, and the defendant's parents' house was two miles from the scene. Calisto's house was approximately four miles away. MacDonald testified generally that the usual range of a cell tower in this area was roughly two miles (the range was smaller in crowded city neighborhoods than in rural areas), but many factors affected that distance. Because he did not **278 have the technical knowledge or background, he did not know what factors would have affected the way that the cellular telephones attached to the specific cell towers in this case. MacDonald's testimony, and the charts and maps he used to explain the locations of the cell site towers, emphasized two T-Mobile towers that were closest to the scene of the shooting. One was eight-tenths of a mile away, and one was four-tenths *954 of a mile distant. MacDonald testified that two calls to Castro from Cauris's cellular telephone, shortly after 6 P.M. , connected through the tower that is eight-tenths of one mile from the scene.[10]
The Commonwealth also called Peter Smith, a civilian employee of the Federal Bureau of Investigation in its forensic audio, video, and image analysis unit, to testify concerning the surveillance video footage and a video presentation that Smith had created which superimposed images from Ulrich's "reenactment" on the surveillance footage. The composite video presentation showed individual images of Cauris's mother's minivan, "fading back and forth" between images of the unknown vehicle from the same angles. Smith testified that the recordings were not clear enough to distinguish any identifying characteristics (such as dents, scratches, rust spots, or stickers) or unique characteristics (such as vehicle identification numbers and license plate numbers) that might have helped to determine whether Cauris's mother's minivan was the vehicle in the surveillance video. He noted, however, that the two vehicles shared "class" characteristics, such as size and shape of the windows, bumpers, and doors, the configuration of the taillights and headlights, and the location where the license plate would be attached. As his final conclusion, Smith opined that he could not "exclude" the possibility that the vehicles depicted in the two video recordings were the same.[11]
The defendant moved for required findings of not guilty at the close of the Commonwealth's case and again at the close of all the evidence. Both motions were denied. On September 9, 2013, the jury found the defendant guilty of murder in the first degree.
2. Discussion. In this direct appeal, the defendant raises four claims. First, he argues that the evidence was insufficient to allow **279 a rational jury to conclude, beyond a reasonable doubt, that he was guilty of murder in the first degree. Second, he claims that the judge erred in allowing the admission of MacDonald's testimony regarding the CSLI. Third, the defendant challenges the judge's decision to allow the introduction of Smith's video presentation, which compared still photographs from the surveillance footage and Ulrich's "reenactment." Fourth, the defendant contends that the judge should not have allowed Ulrich, who testified as the key summation witness for the Commonwealth, to sit at the prosecution table throughout the trial.
a. Sufficiency of the evidence. To convict a defendant of murder in the first degree under a theory of deliberate premeditation, the Commonwealth must prove that the defendant intentionally caused the death of the victim "after a period of reflection." Model Jury Instructions on Homicide 46 (2018). See Commonwealth v. Chipman, 418 Mass. 262, 269, 635 N.E.2d 1204 (1994). "No particular period of reflection is required for deliberate premeditation to be found." Id. at 269, 635 N.E.2d 1204, and cases cited. To convict a defendant as a joint venturer, the Commonwealth must prove beyond a reasonable doubt that the "defendant knowingly participated in the commission of the crime ... with the intent required to commit the *955 crime." Model Jury Instructions on Homicide 13 (2018). See Commonwealth v. Zanetti, 454 Mass. 449, 468, 470, 910 N.E.2d 869 (Appendix) (2009).
In determining whether the evidence was sufficient to sustain a conviction, we consider the evidence in the light most favorable to the Commonwealth. Latimore, 378 Mass. at 677, 393 N.E.2d 370. "A conviction may rest exclusively on circumstantial evidence, and, in evaluating that evidence, we draw all reasonable inferences in favor of the Commonwealth." Commonwealth v. Jones, 477 Mass. 307, 316, 77 N.E.3d 278 (2017). Inferences "need only be reasonable and possible and need not be necessary or inescapable." Commonwealth v. Lao, 443 Mass. 770, 779, 824 N.E.2d 821 (2005), S.C., 450 Mass. 215, 877 N.E.2d 557 (2007) and 460 Mass. 12, 948 N.E.2d 1209 (2011), quoting Commonwealth v. Longo, 402 Mass. 482, 487, 524 N.E.2d 67 (1988). "A conviction may not, however, be based on conjecture or on inference piled upon inference." Jones, supra.
Considering the evidence in this light, and cognizant of the evidence, introduced at both this trial and Cauris's, that we subsequently determined was not sufficient to sustain Cauris's conviction of murder in the first degree as a joint venturer, see Commonwealth v. Gonzalez, 475 Mass. 396, 412-413, 56 N.E.3d 1271 (2016), we **280 conclude that, here, the evidence would have permitted a rational juror to find, beyond a reasonable doubt, that the defendant participated in the shooting and that he had the requisite mental state to sustain a conviction of murder in the first degree on a theory of deliberate premeditation.
While the cellular telephone and CSLI evidence could not be relied upon as evidence of the defendant's precise location at any point on the day of the shooting, the telephone call logs were consistent with an inference that the defendant and his friends were in close contact throughout the afternoon, and then stopped calling each other for the fifteen minutes immediately before the shooting, because they were together at the crime scene. While not a necessary inference, viewed in the light most favorable to the Commonwealth, it is a permissible inference that could, combined with other evidence that was introduced at the defendant's trial that was not introduced at Cauris's trial, create a network of facts sufficient to establish beyond a reasonable doubt that the defendant participated in the shooting and intended the result.
The video surveillance evidence and the video presentation with the constructed overlays of the suspect vehicle and Cauris's mother's minivan did nothing to identify Cauris's mother's vehicle as the one that dropped off the four people near the victim's vehicle (also a Dodge Caravan minivan). The Commonwealth's expert testified that he could see no identifying characteristics and that, in addition to other Dodge Caravans, there were minivans from other manufacturers or other years that shared the same "class characteristics" as did Cauris's mother's vehicle and the suspect vehicle. He had not attempted to determine which other vehicles and makes those might be, or how many of them belonged to owners in Lawrence or nearby towns.
Nonetheless, the evidence was not inconsistent with Cauris's mother's vehicle being used to drop off the four individuals, and tended to support the Commonwealth's case. See Commonwealth v. Fayerweather, 406 Mass. 78, 83, 546 N.E.2d 345 (1989), quoting Commonwealth v. Chretien, 383 Mass. 123, 136, 417 N.E.2d 1203 (1981), and *956 Commonwealth v. Copeland, 375 Mass. 438, 443, 377 N.E.2d 930 (1978) (evidence generally is relevant where it has "a 'rational tendency to prove an issue in the case,' " or makes "[a] desired inference more probable than it would be without [the]" evidence). To be relevant, and admissible, evidence "need not establish directly the proposition sought; it must only provide a link in the chain of proof." **281 Commonwealth v. Gordon, 407 Mass. 340, 351, 553 N.E.2d 915 (1990), quoting Commonwealth v. Tobin, 392 Mass. 604, 613, 467 N.E.2d 826 (1984). Indeed, evidence may be relevant if it only "throw[s] light" on an issue. See Commonwealth v. Palladino, 346 Mass. 720, 726, 195 N.E.2d 769 (1964).
In addition, and in contrast to the evidence at Cauris's trial, which was insufficient to establish her state of mind, here there was direct evidence of the defendant's state of mind shortly prior to and after the shooting, through his own words and actions. The jury could have found the following. First, the defendant had motive to kill the victim. The victim had punched the defendant in the face, knocking out his tooth in front of both the defendant's and the victim's friends. The victim had taunted the defendant by displaying the tooth to him, and then publicly tried to sell the tooth to the defendant's mother by yelling at her from across the street, while displaying the tooth and laughing.
Importantly, and unlike at Cauris's trial, there also was significant evidence that the defendant was angered by the victim's actions, and intended to act on that motive. Before the physical altercation between the defendant and the victim at the fast food restaurant, they had been yelling and "screaming" at each other and the defendant had been "wav[ing]" a knife around, letting it be known that he had it, while yelling, "Bitch ass nigger. You gonna snuff me, bitch ass nigger?" After the victim knocked out the defendant's tooth, the defendant swore at the victim, then followed him as the victim was heading back to his vehicle. The defendant was stopped from continuing to pursue the victim by the intervention of Cauris, who drove up and repeatedly demanded that the defendant get into her vehicle. As the defendant finally did so, he called out what the jury could have interpreted as another threat, yelling, "Fuck you, it's not going to stay like this." When he was interviewed by police three days after the killing, the defendant did not say that he had thrown a cellular telephone, instead claiming that the victim had stolen it. The defendant said that the victim had hit him in the face with a pipe and that he had responded by throwing a knife at the victim, intending to hit him, but had missed.
Although the defendant's statement that "it's not going to stay like this" was introduced in evidence in Cauris's trial, see Gonzalez, 475 Mass. at 399, 56 N.E.3d 1271, it was not considered evidence of motive on her part. "Rather than imputing this state of mind to the defendant, the threat put the killing into the context of a narrative that was comprehensible to the jury and was relevant to the purpose **282 of the joint venture." Commonwealth v. Fernandes, 427 Mass. 90, 95, 692 N.E.2d 3 (1998). Here, by contrast, the jury could have inferred that the defendant intended to harm the victim, based on his threat to do so and on his statement to police that he had thrown a knife at the victim (potentially a deadly act), but had missed. In addition, the defendant demonstrated hostility to the victim by throwing the cellular telephone at him and by chasing him through the fast food parking lot, a chase that was interrupted by Cauris. From this, the jury could have inferred that the defendant's intent to harm the victim was carried out later that day. See Commonwealth v. Henson, 394 Mass. 584, 591, 476 N.E.2d 947 (1985), and cases cited (evidence *957 of "intent to kill may be inferred from the defendant's conduct").
While the defendant claims in this direct appeal that his statement does not rise to the level of a threat to kill, "[t]he assessment whether the defendant made a threat is not confined to a technical analysis of the precise words uttered. Rather, the jury may consider the context in which the allegedly threatening statement was made and all of the surrounding circumstances." Commonwealth v. Sholley, 432 Mass. 721, 725, 739 N.E.2d 236 (2000). "Here, the context of the defendant's statement, along with his demeanor and tone of voice at the time the statement was made, would permit the jury to conclude that the statement was intended as a threat." Id. at 725-726, 739 N.E.2d 236. At the time of the statement, the defendant had been waving a knife in the air and had thrown his cellular telephone at the victim. Viewing the evidence in the light most favorable to the Commonwealth, a reasonable jury could have concluded that the defendant's statement was a threat to kill, and could have inferred from that threat that the defendant intended to and did kill the victim.
At Cauris's trial, the Commonwealth attempted to establish consciousness of guilt by two of her statements to police. We noted both that consciousness of guilt is not sufficient to establish guilt, and that indications of a defendant's state of mind, coupled with other evidence, can be sufficient to establish guilt. See Commonwealth v. Vick, 454 Mass. 418, 424, 910 N.E.2d 339 (2009) ("While a conviction may not be based solely on evidence of consciousness of guilt, see Commonwealth v. Darnell D., 445 Mass. 670, 674, 840 N.E.2d 33 [2005], indications of a defendant's state of mind, coupled with other evidence, can be sufficient to establish guilt. See Commonwealth v. Doucette, 408 Mass. 454, 461, 559 N.E.2d 1225 [1990]"). We then concluded that the consciousness of guilt evidence in that case, in **283 combination with the cellular telephone records and the video recordings, did not suffice to meet the Commonwealth's burden. Gonzalez, 475 Mass. at 412-413, 56 N.E.3d 1271.
Here, however, the evidence of consciousness of guilt was much stronger than at Cauris's trial, and could have contributed to the overall evidence of guilt. See Commonwealth v. Salim, 399 Mass. 227, 233, 503 N.E.2d 1267 (1987) (evidence taken together may form proof of crime where any individual fact, taken alone, does not). "[E]vidence of motive and consciousness of guilt is [not] sufficient to withstand [a] defendant's motion for [a] required finding of not guilty." Commonwealth v. Mazza, 399 Mass. 395, 398, 504 N.E.2d 630 (1987). See Commonwealth v. Woods, 466 Mass. 707, 713-716, 1 N.E.3d 762, cert. denied, 573 U.S. 937, 134 S.Ct. 2855, 189 L.Ed.2d 818 (2014), S.C., 480 Mass. 231, 102 N.E.3d 961 (2018) ; Commonwealth v. Morris, 465 Mass. 733, 734-738, 991 N.E.2d 1081 (2013). Such evidence, however, in conjunction with other evidence, may suffice to support a conviction. See Commonwealth v. Arroyo, 442 Mass. 135, 140-141, 810 N.E.2d 1201 (2004).
The jury could have found that the defendant displayed consciousness of guilt by claiming, repeatedly during the interview, to have arrived at Calisto's house between 5 and 6 P.M. instead of, as Calisto testified, at "6:15/6:10/6:20-ish," and by at times insisting that he was at Calisto's house no later than 5 P.M. , where Cauris had told police that they arrived "around six."[12]
*958 When he was asked for the names of his friends, the defendant provided police a number of names of people that his friends did not recognize, and police never located, and did not give police the names of Castro, Wyatt, or Stackerman. Moreover, he denied knowing the victim's name even though he said he had spoken to the victim about the money that the victim owed Cauris, and claimed not to recognize the telephone number that was registered under the defendant's name that was being used by Stackerman. After initially denying any knowledge of the number that call logs showed had telephoned him repeatedly, the defendant claimed to have remembered that he had taken out another subscription for someone named "Ricard," the name of Cauris's brother. The Commonwealth also introduced evidence that the defendant and Cauris went to the Dominican Republic on January 29, 2009, to get his tooth fixed; he got it fixed for somewhere between $100 and $200, and stayed there working on his family's **284 farm for eight months.[13]
The judge properly instructed that intentionally false statements and flight may indicate feelings of guilt and, in turn, actual guilt, but that "there are numerous reasons why an innocent person might flee" and "guilty feelings are sometimes present in innocent people." Additionally, she properly instructed that evidence of consciousness of guilt is not sufficient alone to sustain a conviction. Neither evidence of consciousness of guilt nor consciousness of guilt as demonstrated by flight is sufficient to sustain a conviction. See Morris, 465 Mass. at 734-738, 991 N.E.2d 1081 (neither evidence of consciousness of guilt nor consciousness of guilt as demonstrated by flight is sufficient to sustain conviction, but such evidence may be used, along with other evidence, to establish proof beyond reasonable doubt). This portion of the evidence formed a proper part of the "mosaic of evidence" upon which the jury could have concluded that the Commonwealth met its burden of proof, beyond a reasonable doubt, that the defendant had committed the crime. See Salim, 399 Mass. at 233, 503 N.E.2d 1267.
Moreover, the jury heard direct evidence of verbal threats and attempted assaults by the defendant, approximately sixteen hours before the shooting, from which the jury could have inferred that the threat was, in fact, put into effect.[14] See Commonwealth v. Marrero, 459 Mass. 235, 248, 945 N.E.2d 284 (2011) (defendant's statement, "I'm going to kill you," was sufficient to demonstrate requisite intent to kill victim). "These circumstances, no one of which alone would be enough to convict the defendant, combine to form a fabric of proof that was sufficient to warrant the jury's finding beyond a reasonable doubt that the defendant" was guilty of murder in the first degree on a theory of deliberate premeditation as a joint venturer. Commonwealth v. Rojas, 388 Mass. 626, 630, 447 N.E.2d 4 (1983).
*959 In addition to proving that the defendant knowingly participated in the commission of the crime, the Commonwealth must also prove, beyond a reasonable doubt, that the defendant had the required mental state. See Zanetti, 454 Mass. at 470, 910 N.E.2d 869 (Appendix).
**285 "Statements, not too remote in time, which indicate an intention to engage in particular conduct, are admissible to prove that the conduct was, in fact, put in effect." Commonwealth v. Ferreira, 381 Mass. 306, 310, 409 N.E.2d 188 (1980). See Cook v. Moore, 11 Cush. 213, 217, 65 Mass. 213 (1853) ("The existence in the mind of a deliberate design to do a certain act, when once proved, may properly lead to the inference that the intent once harbored continued and was carried into effect by acts long subsequent to the origin of the motive by which they were prompted"). It follows that "[a] declarant's threat to 'get' or kill someone is admissible to show that the declarant had a particular state of mind and that he carried out his intent." Fernandes, 427 Mass. at 95, 692 N.E.2d 3.
After reviewing the proceedings at Cauris's trial, we concluded that it would have required jurors improperly to infer, based on evidence that Cauris's minivan and cellular telephone were involved in the crime, that she was, too. See Gonzalez, 475 Mass. at 412, 415-416, 56 N.E.3d 1271. Here, by contrast, there was sufficient other evidence to support the jury's conviction of the defendant of murder in the first degree as a joint venturer on a theory of deliberate premeditation.[15] In combination with the evidence that also had been admitted at Cauris's trial, the entirety of the facts presented "form[s] a fabric of proof that was sufficient to warrant the jury's finding beyond a reasonable doubt that the defendant" was guilty of murder in the first degree on a theory of deliberate premeditation as a joint venturer. Rojas, 388 Mass. at 630, 447 N.E.2d 4.
b. CSLI testimony. The defendant argues that MacDonald should not have been allowed to testify regarding how cell sites operate and how to locate a cellular telephone based on historical cell site information. The defendant did not object to all of MacDonald's testimony, but did object to MacDonald's testimony as it related to such usage of CSLI.
"A trial judge has wide discretion to qualify an expert witness and to decide whether the witness's testimony should be admitted." Commonwealth v. Frangipane, 433 Mass. 527, 533, 744 N.E.2d 25 (2001). Such a decision "will be reversed only where it constitutes an abuse of discretion or other error of law." Id. See **286 L.L. v. Commonwealth, 470 Mass. 169, 185 n.27, 20 N.E.3d 930 (2014) ("a judge's discretionary decision constitutes an abuse of discretion where we conclude the judge made a clear error of judgment in weighing the factors relevant to the decision ... such that the decision falls outside the range of reasonable alternatives" [quotation and citation omitted] ).
In Gonzalez, 475 Mass. at 412 n.37, 56 N.E.3d 1271, we observed that while MacDonald's testimony was generally admissible, "this is not without some doubt with respect to two of his opinions. Those opinions -- that calls 'typically' are transmitted through the closest cellular site, and that a call from Calisto's address was unlikely to have been transmitted through cell site *960 4449 -- were objected to by the defendant and may well have required a witness with greater technical expertise." Because the CSLI was not able to place any of the participants at or near the scene of the shooting, and MacDonald did not contend otherwise, in reaching our decision as to the sufficiency of the evidence, we have relied on the call logs, which MacDonald was well-qualified to introduce, and have not relied on the CSLI evidence.
We note that MacDonald properly qualified his testimony and explained that, even where a particular cellular telephone was most likely to connect to the nearest tower, there were many reasons why that might not happen. Thus, the fact that he did not know or investigate the reasons why particular calls had connected to particular towers did not prejudice the defendant. MacDonald did not claim, improperly, that Cauris's telephone must have been near a particular tower when it connected to that tower, even though he opined he would not have expected it to have used a tower near the scene had the telephone been in the vicinity of Calisto's house. Contrast United States v. Hill, 818 F.3d 289, 299 (7th Cir. 2016) ("The admission of historical cell-site evidence that overpromises on the technique's precision -- or fails to account adequately for its potential flaws -- may well be an abuse of discretion"). There also was undisputed evidence, through the call logs and the CSLI records, as the defendant's counsel emphasized in cross-examination, that numerous other calls from Cauris's cellular telephone attached to the cell tower at issue, near the crime scene, throughout the day, and at times when it was not disputed that she had been at her house. Thus, we are confident that, while it might have been better practice to exclude evidence that was of little assistance to the jury and that possibly could have been confusing, the judge did **287 not abuse her discretion in allowing MacDonald's testimony about certain aspects of the CSLI. That portion of MacDonald's testimony concerning the reasons that cellular telephones connect to cell towers, and what he "expected" a particular telephone would be most likely to do here, would not have had any impact on the jury's verdict.
c. Video simulation. The defendant challenges the admission of the video recording created by Smith that compared still images of the unknown vehicle from the surveillance videos and images of Cauris's mother's minivan taken during the simulation drive by Ulrich, as well as Smith's accompanying testimony. The purpose of the video was to pair images of the two vehicles in similar lighting and from similar angles to determine whether Cauris's mother's minivan could be identified as the vehicle in the surveillance videos. Smith concluded that he could "not exclude" the possibility that Cauris's mother's minivan was the vehicle in the surveillance images, but also that he could not determine that it was the same vehicle; the quality of the video was not good enough to discern identifying or unique characteristics. Cauris made a similar claim in her appeal, but, given our result in that case, we did not reach the issue. See Gonzalez, 475 Mass. at 397, 56 N.E.3d 1271. The video was admitted at trial without objection, so we review for a substantial likelihood of a miscarriage of justice. See Commonwealth v. Lennon, 399 Mass. 443, 448 n.6, 504 N.E.2d 1051 (1987).
"A videotaped demonstration may be admitted in evidence provided it sufficiently resembles the actual event so as to be fair and informative" (quotation and citation omitted). Chipman, 418 Mass. at 270, 635 N.E.2d 1204. See Commonwealth v. Chukwuezi, 475 Mass. 597, 603, 59 N.E.3d 380 (2016) ("In determining whether *961 to admit a computer-generated simulation ..., a trial judge must determine whether the simulation is relevant evidence; whether the simulation's conditions correspond to those of the original incident ...; and whether the evidence will confuse or mislead the jury" [citation omitted] ). "Whether the conditions were sufficiently similar to make the observation of any value in aiding the jury to pass upon the issue submitted to them was primarily for the trial court to determine as a matter of discretion." Field v. Gowdy, 199 Mass. 568, 574, 85 N.E. 884 (1908).
Ulrich testified to the process of filming the simulation video, including efforts to recreate lighting conditions. Smith then explained how he paired still images of the vehicles from the **288 surveillance video and the simulation video to compare characteristics vehicle. Smith opined that Cauris's mother's minivan was consistent with the unknown vehicle, but could not be identified as being the same vehicle. This testimony was relevant to the jury's determination whether Cauris's mother's minivan was used to transport the individuals who shot the victim. The judge did not abuse her discretion in allowing the introduction of the video presentation and Smith's testimony. While Smith's testimony and the video evidence did little to establish whether Cauris's mother's minivan was used during the commission of the crime, it did provide information from which the jury could have inferred that it was more likely that Cauris's mother's minivan had been involved in the shooting. See Commonwealth v. Pytou Heang, 458 Mass. 827, 851, 942 N.E.2d 927 (2011) ("Evidence does not have to be conclusive of an issue to be admissible"; admissible evidence may simply make Commonwealth's contention more probable than it would be without that evidence [quotation and citation omitted] ). See Mass. G. Evid. § 401 (2011) (relevant evidence "is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence").
d. Presence of police witness at prosecutor's table. The defendant contends that the judge should not have allowed Ulrich to sit at the prosecution table throughout the trial, when he testified as an important witness for the Commonwealth and summed up essentially all of the Commonwealth's other evidence. The defendant did not object to the portion of the Commonwealth's motion exempting Ulrich from sequestration, but did object to the portion requesting that he sit at counsel's table. Specifically, the defendant noted a concern "that this jury, which ultimately has to pass on what [Ulrich] says, can develop ... a sense of him in the courtroom every day actively assisting, and it changes the dynamic of him as a traditional witness."
"While we have cautioned the Commonwealth to be wary of deciding to have an essential witness sit at the counsel table, we also have determined the necessity of reserving the determination of the need for such a seating arrangement to the discretion of the judge." Commonwealth v. Auguste, 414 Mass. 51, 59-60, 605 N.E.2d 819 (1992), citing Commonwealth v. Perez, 405 Mass. 339, 344, 540 N.E.2d 681 (1989). See Perez, supra at 342 n.4, 540 N.E.2d 681. In challenging such a seating arrangement, we have said that "[t]he defendant cannot rest upon a bare **289 allegation that this police officer had a 'cloak of credibility' which was accentuated by his presence at counsel table as a sufficient basis to overturn [the defendant's] convictions." Id. at 343, 540 N.E.2d 681.
The judge here concluded that Ulrich's assistance was essential to the management of the case. Cf.
*962 Commonwealth v. Therrien, 359 Mass. 500, 508, 269 N.E.2d 687 (1971) (no error in exempting witness from sequestration where witness is essential to management of case). The judge also attempted to combat any perceived "cloak of credibility" by asking potential jurors during voir dire whether they would credit the testimony of police witnesses more than the testimony of civilians simply because they were police officers. In light of this, we cannot say that the judge abused her discretion in allowing Ulrich to be seated at the prosecution table.
We emphasize, however, that the Commonwealth should proceed with caution in selecting a crucial witness to sit at counsel table and to help manage the case, prior to his testimony as the last of the Commonwealth's witnesses. See Commonwealth v. Salcedo, 405 Mass. 346, 348, 540 N.E.2d 1304 (1989), citing Perez, 405 Mass. at 339 & n.4, 540 N.E.2d 681 (discussing "[the] general undesirability of having a key prosecution witness sit at counsel table"). Particularly where the lead prosecutor is assisted by a second chair, the Commonwealth should consider whether that attorney, or another member of the prosecution team who will not be a witness, could assist with case management.
e. Relief pursuant to G. L. c. 278, § 33E. The defendant asks that we exercise our extraordinary power pursuant to G. L. c. 278, § 33E, to order a new trial or to reduce the verdict to murder in the second degree. After carefully reviewing the record pursuant to our duty under G. L. c. 278, § 33E, we decline to set aside the verdicts or to reduce the degree of guilt.
Judgment affirmed.

The Commonwealth also indicted four other individuals on charges of murder in the first degree for their alleged roles in the shooting. One, Yoshio Stackerman, was convicted of murder in the second degree, and that conviction was affirmed by the Appeals Court. See Commonwealth v. Stackerman, 91 Mass. App. Ct. 1108, 79 N.E.3d 1112 (2017). The Commonwealth dismissed the case against a second, Francis Wyatt, and a third, Thomas Castro, was acquitted of all charges. A few weeks before the defendant's second trial, his girl friend, Cauris Gonzalez, was convicted of murder in the first degree; this court subsequently vacated the conviction on grounds of insufficient evidence. See Commonwealth v. Gonzalez, 475 Mass. 396, 407, 56 N.E.3d 1271 (2016).

Cauris Gonzalez and the victim, Robert Gonzalez, are not related. Because they share a last name, for clarity, we refer to Cauris by her first name.

The defendant's parents' house had a land line.

The defendant's mother testified that Cauris and the defendant drove her to work at some point between 3:30 and 4 p.m. , after she called Cauris to ask her for a ride; records from the cellular telephone service provider indicate that a call from the defendant's mother was placed to Cauris's telephone number during that time frame.

The time of the shooting, at approximately 5:57 p.m. , was determined based on the surveillance footage (which was four minutes and forty-two seconds off from the actual time, see note 6, infra ) and a call to 911 at 5:59 p.m. that was placed by one of the victim's friends.

All of the times stated are adjusted by subtracting four minutes and forty-two seconds from the time indicated on the surveillance footage, which was known to be that much in advance of the actual time.

Evidence was introduced concerning the identity of the passenger, but he did not testify at trial.

An H & K USB compact semiautomatic pistol obtained from a friend of Stackerman on January 14, 2009, was identified to a reasonable degree of ballistic certainty as the .45 caliber firearm used in the shooting. The friend did not testify, but his wife testified that Stackerman arrived at their house at some point between 6 and 9 p.m. on January 10, 2009, looking for her husband. At trial, the wife indicated that she could not be more precise about the time frame, but on January 19, 2009, she told a police lieutenant that Stackerman had arrived after 7:30 p.m. and that her husband had been at home with her between 5 and 6 p.m. She identified Stackerman and Wyatt as friends of her husband's.

The defendant told police that he had been staying at Cauris's house, on his mother's suggestion, after she called him to say that there were people outside his house "looking" for him. The defendant said that they believed he had had something to do with the shooting because of his earlier fight with the victim.

Call logs showed that twenty-four other calls from Cauris's cellular telephone connected to the same tower that day, including at times when it was undisputed that Cauris was at her parents' house.

Smith also testified that he did not perform an examination that would have narrowed the vehicle identification to a specific year or make and model. He acknowledged that some minivans made in other years or by other manufacturers also share the same class characteristics.

The defendant was aware of the nature of the interview from the beginning. When the defendant entered the room to speak with investigators at his parents' house, he immediately asked them whether they were there "about the fight."

Cauris traveled with him but returned to the United States approximately one month later. See Gonzalez, 475 Mass. at 404, 56 N.E.3d 1271. The Commonwealth argued that the jury could infer consciousness of guilt from the defendant's longer stay.

Evidence was also introduced, including in the defendant's own statement, that, in the days after the shooting, he was staying at Cauris's house, on his mother's suggestion, because there were people outside his house, looking for him. The defendant thought that those people believed he had had some involvement in the shooting, based on the earlier fight.

The jury reasonably could have inferred that Stackerman was tied to the shooting by an inference that he left one of the firearms with Medina, who then turned it over to police shortly thereafter. The jury also could have inferred that Castro was tied to the scene by evidence that his cellular telephone was used to request a taxicab pick-up two blocks from the scene, within minutes after the shooting.